POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Co-Lead Plaintiffs Rhys Brooks and
Jonathan Otte and Additional Plaintiff Sandra
Lynn Grant and Co-Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH ALLARD, RHYS BROOKS, and JONATHAN OTTE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>JASPER THERAPEUTICS, INC., RONALD A. MARTELL, HERBERT C. CROSS, and EDWIN TUCKER,<br><br>Defendants. | Case No. 5:25-cv-08010-BLF<br><br><u>CLASS ACTION</u><br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ...............................................................................1

II.   JURISDICTION AND VENUE ........................................................................11

III.  PARTIES ..........................................................................................................11

      A.   Plaintiffs.................................................................................................. 11

      B.   Defendants .............................................................................................. 11

      C.   Relevant Non-Parties ............................................................................. 13

IV.   SUBSTANTIVE ALLEGATIONS .................................................................14

      A.   Background ............................................................................................. 14

      B.   Chronic Spontaneous Urticaria.............................................................. 15

      C.   Jasper Prioritizes Briquilimab for CSU ................................................ 17

      D.   Relevant Aspects of and Requirements for the IND Process ................ 18

           i.    IND Process .................................................................................18

           ii.   Phases of Studies..........................................................................19

           iii.  Requirements for Investigators ...................................................21

      E.   Jasper's BEACON Study of Briquilimab for CSU................................ 22

      F.   Defendants Face Pressure to Make Quick Progress, Enroll More Patients,
           and Test Higher Doses of Briquilimab .................................................. 29

      G.   In Violation of FDA Regulations, Defendants Remove Information about
           the BEACON Study Sites from ClinicalTrials.gov ............................... 33

      H.   Defendants Tout Initial Data from the BEACON Study; The Market
           Reaction is Not As Positive ................................................................... 37

      I.    Defendants Disclose "Confounded" Results in the BEACON Study,
           Defendant Tucker's Departure, and Cost-Cutting Measures................. 46

      J.    Jasper's Disclosures Regarding Its Investigation Into the Lack of Efficacy
           Shown in Cohorts 8 and 9..................................................................... 49

      K.   Jasper Terminates Defendant Martell's Employment ........................... 51

V.    DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS...................52

i

VI.    LOSS CAUSATION................................................................................................67

VII.   THE INDIVIDUAL DEFENDANTS CLOSELY MONITORED THE BEACON
       STUDY .................................................................................................................74

VIII.  CLASS ACTION ALLEGATIONS ......................................................................76

IX.    COUNTS................................................................................................................78

COUNT I .............................................................................................................................78

COUNT II ............................................................................................................................81

X.     PRAYER FOR RELIEF .......................................................................................83

XI.    DEMAND FOR TRIAL BY JURY ......................................................................83

ii

AMENDED CLASS ACTION COMPLAINT

Court-appointed Co-Lead Plaintiffs Kenneth Allard, Rhys Brooks, and Jonathan Otte, and Additional Plaintiff Sandra Lynn Grant (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Jasper Therapeutics, Inc. ("Jasper" or the "Company"), analysts' reports and advisories about the Company, information from former Jasper employees, consultation with experts, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Jasper's publicly-traded securities between November 30, 2023 and January 7, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.[1]

---

[1] All emphases are added unless otherwise indicated. Defendants are Jasper, Ronald A. Martell ("Martell"), Herbert C. Cross ("Cross"), and Edwin Tucker ("Tucker").

2.      At the beginning of the Class Period, Jasper had incurred significant losses and negative cash flows from operations. Jasper was developing an investigational drug, and it was expensive. With no product yet on the market, Jasper needed outside funding, and investor sentiment was critical. To stoke investor interest, Jasper set an ambitious timeline for commencing a registrational trial of Jasper's most promising drug. That timeline would not hold. Defendants knew, but failed to disclose, that (i) Jasper would need to amend the protocol for a pivotal Phase 1b/2a trial to include additional cohorts, and (ii) the amended protocol and additional cohorts carried undisclosed risks, which risks were exacerbated by Defendants' decision, in violation of FDA regulations and hidden from investors, to include unqualified investigators and facilities in the trial.

3.      Jasper is a clinical-stage biotechnology company and its lead product candidate is briquilimab, a monoclonal antibody designed to block stem cell factor ("SCF") from binding to and signaling through the CD117 ("c-Kit") receptor on mast and stem cells. Mast cells are immune cells that contain, and release, chemicals such as histamine, which plays a key role in inducing the immune mechanism known as inflammation. According to Jasper, the "SCF/c-Kit pathway is a survival signal for mast cells and [the Company] believe[s] that blocking this pathway may lead to depletion of these cells throughout the body, including in the lungs and in the skin," thus inhibiting the release of histamines by those cells.

4.      Jasper focuses on developing briquilimab to target mast cell-driven diseases such as chronic urticaria ("CU") and asthma. Urticaria, or hives, are itchy welts or wheals on the skin caused by the release of histamine. CU includes both chronic spontaneous urticaria ("CSU"), which has no apparent trigger and is thus "spontaneous," and chronic inducible urticaria ("CIndU"), which has an identifiable trigger (such as cold, heat, pressure, or exercise) and is thus "inducible." Both involve the release of histamines by mast cells.

2

5. During the Class Period, the Company increasingly prioritized the development of briquilimab for CSU. The FDA-approved treatment for CSU is, first, antihistamines, at a standard dose and then up to four times the standard dose, and second, omalizumab (brand name: Xolair), a monoclonal antibody designed to reduce certain autoantibodies that activate mast cells.

6. In June 2023, Defendants told investors that by the end of 2023, the Company expected to file an investigational new drug application ("IND") with the Food and Drug Administration ("FDA") for a Phase 1b/2a repeat dose clinical study of briquilimab for the treatment of CSU, as well as to dose the first patient in the study. On October 9, 2023, Defendants announced that they had secured FDA clearance for this IND, permitting the Company to begin the study, which would be called the "BEACON" study. Defendant Martell, Jasper's CEO at the time, called this a "critical milestone for Jasper."

7. The study, which was limited to CSU patients that had not sufficiently responded to either antihistamines or omalizumab—the two drugs in the existing FDA-approved treatment protocol—began the following month, in November 2023. On November 30, 2023, Defendants announced that the first patient had been dosed in the BEACON study.

8. During the rest of 2023 and throughout 2024, Defendants emphasized that the results of the BEACON study would provide the basis for the Company to select the specific doses to be studied in subsequent trials, including a phase 2b/3 "registrational" study. Defendants told investors that the phase 2b study was slated to begin in the second half of 2025. These statements were misleading. As Defendants knew, Jasper could *not* go straight to a registrational study of briquilimab without first amending the study design and adding additional cohorts of patients.

9. On January 8, 2025, Defendants disclosed preliminary data, touting "positive preliminary data from Jasper's ongoing BEACON Phase 1b/2a study of subcutaneous briquilimab

3

in adult participants with CSU." While Defendants claimed the results were "positive," the market reacted negatively and the stock dropped significantly. Investors were confused and disappointed by the published results. Though certain cohorts showed good results, the critical 180 mg dose arm of the study underperformed. Management blamed the 180 mg dose underperformance on *the improper inclusion of two patients who had been misdiagnosed as having CSU*. This was a significant setback. Jasper would have to conduct additional testing before commencing a registrational study.

10.    On January 8, 2025, Defendants also announced that they were enrolling new patients into new cohorts – numbered 8 and 9 – and that such patients would *not* be required to have first tried, and failed, treatment with omalizumab. Defendants indicated that they could generate more data by making this change to the enrollment criteria, setting the Company up to more quickly progress into a subsequent registrational trial.

11.    However, when Defendants reported data from cohorts 8 and 9 of the BEACON Study on July 7, 2025, there was a problem – 10 of the 12 patients did not respond to the drug. According to Jasper's press release, the "[r]esults from the 240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts *appear to be confounded* by an issue with one drug product lot used in those cohorts, with 10 of the 13 patients dosed with drug from the lot in question."[2] Those ten patients had "lower than expected drops in mean tryptase levels and *no discernable impact on UAS7 scores*," meaning that *briquilimab had no noticeable effect on their urticaria symptoms*.[3]

---

[2] "Q" means "every or each." "Q8W" means every eight weeks; "Q12W" means every twelve weeks, and so forth.

[3] A UAS7 score is determined using a standardized patient-reported questionnaire, the Urticaria Activity Score ("UAS") worksheet, concerning the severity of the patient's hives and itchiness over a seven-day period. The patient assigns a score to the number of hives: zero (for no hives), one (mild, or one to six hives), two (moderate, or seven to twelve hives), or three (severe, or more than twelve hives). The patient also assigns a score to the severity of their itchiness: zero (none), one (mild), two (moderate), or three (severe). The UAS7 score is the sum of the

4

Defendants blamed the bad results on a bad batch of briquilimab and stated that they were "investigating the drug product lot in question and expect[ed] to have the results of that investigation in the coming weeks."

12.     These test results were a significant setback for Jasper obtaining FDA approval of briquilimab. Critically, this would mean the Company's planned registrational trial for briquilimab in CSU, originally targeted for 2025, would be delayed to mid-2026.

13.     Just as significant, Jasper was running out of money and the negative test results made it more difficult to raise funding from the public markets. As a result, Defendants disclosed that Jasper "w[ould] be implementing a number of cost cutting measures to reduce burn and extend our cash runway in light of this delay." Other Jasper studies were also thrown into turmoil. Jasper announced that it would have to abandon its trials aimed at treating asthma to "focus resources on advancing briquilimab in CSU" among other trials. The impact on the business was profound. Jasper's stock price fell **55.1%** in response to this news.

14.     Two days later, on July 9, 2025, Defendants announced a corporate reorganization and other cost cutting measures, including a 50% workforce reduction. Defendant Edwin Tucker, Jasper's Chief Medical Officer ("CMO") and the person overseeing the BEACON study, was leaving the Company effective August 1, 2025. Defendants confirmed that *all* other clinical and preclinical programs would also be halted "[i]n order to focus resources on the development of briquilimab in chronic urticaria."

15.     On December 2, 2025, Jasper revealed the results of its investigation into the "confounded data" released on July 7, 2025. On that day, Defendants disclosed that the adverse results released in July were *not* due to any issue with the drug product lot used for the cohorts

---

preceding seven day's itch severity score (ISS) and hives severity score (HSS). The total UAS7 range is zero to 42.

dosed with 240mg Q8W of briquilimab and 240mg followed by 180mg Q8W, respectively. Their internal investigation determined that there was no issue with the drug product lot. Instead, the lack of efficacy in the results for those cohorts (Cohorts 8 and 9) was the result of "*patient selection issues*." Jasper revealed that "*9 of the 10 patients in question did not have CSU*[,] as their symptoms were not mast cell-driven." *Remarkably, the Company was testing briquilimab for CSU in patients that did not have CSU*. This was the same problem that caused the market selloff on January 8, 2025.

16.     Jasper was simply in too much of a rush to enroll patients that it didn't properly vet them to make sure they qualified for the study. To facilitate enrollment in cohorts 8 and 9, Jasper teamed up with unqualified and inexperienced investigators who had access to omalizumab-naïve patients. Unbeknownst to investors, Jasper disregarded federal regulations governing medical trials. "Sponsors who design and pay for clinical trials (e.g., pharmaceutical companies) are required by law to select individuals who are qualified by training and experience to conduct a clinical trial." *Investigator Responsibilities in Clinical Research*, Ochsner Journal, 2020. As set forth in 21 CFR § 312.53(a), "A sponsor shall select only investigators qualified by training and experience as appropriate experts to investigate the drug."

17.     Federal regulation requires a sponsor to vet each investigator enrolling patients in a clinical study. Jasper, as the sponsor, was required to obtain a "curriculum vitae or other statement of qualifications of the investigator showing the education, training, and experience that qualifies the investigator as an expert in the clinical investigation of the drug for the use under investigation." 21 CFR § 312.53(c)(2).

18.     Out of expediency and in violation of federal law, however, Jasper chose investigators that were not qualified, as they could not even identify patients with the disease being investigated. Jasper's own investigation into the cause of the "confounded data" revealed

6

that Jasper, as the sponsor, selected investigators for cohorts 8 and 9 of the Beacon study who were unqualified to properly diagnose patients for inclusion in the study. Indeed, as Jasper's investigation found, "one new site [in the BEACON study] *enrolled 5 patients into active arms of Cohorts 8 & 9 with no CR or WC responses,*" meaning that they did not have CSU and should never have been enrolled in the study to begin with.

19.    As the record, set forth in greater detail below, makes clear, (i) Jasper failed its legal obligation to select as investigators in cohorts 8 and 9 of the BEACON study *only* experts in the treatment of CSU, and (ii) those same investigators misdiagnosed 9 of the 12 patients enrolled in cohorts 8 and 9 as having CSU. Defendants admit that 9 out of the 12 patients enrolled did not have CSU – and that one investigator enrolled 5 patients, *all* of whom were misdiagnosed. As such, Jasper failed to fulfill its legal obligation to select only experts in CSU to act as investigators.

20.    The BEACON study protocol had strict "inclusion criteria" and "exclusion criteria" to ensure that only appropriate CSU patients were admitted to the study. Patients were required to have "[d]iagnosis of CSU for ≥ 6 months (as per local and international guidance)" and the "presence of itch and hives for ≥ 8 consecutive weeks." Jasper's own investigation revealed that investigators in cohorts 8 and 9 had improperly enrolled patients that "had *minimal documented medical history of CSU or past treatments for CSU.*" Again, Jasper's own investigation found evidence that Jasper selected unqualified investigators to conduct the BEACON study, in violation of federal law. As a result, 75% of the patients enrolled in the key cohorts 8 and 9 did not even have CSU.

21.    After conducting an investigation, Jasper disclosed that a panel of KOL (knowledge and opinion leader) experts had recommended certain steps the Company take to "ensure quality patient selection," including: (i) "Ensure sites utilized have a certified

7

Immunologist/Dermatologist with a history of diagnosing and treating CSU patients;" and (ii) "Expanded review of patient history during screening including visual records of lesions." During an investor call, Defendant Martell further noted that "the KOL panel provided us with some really good guidance here. And a few of those things we already implemented, to your point is on the referrals. *If a patient does not come to a treating center with a full medical history, then we're not permitting them in the study*."

22.    Significantly, the KOL advisory panel recommended actions that Jasper had been required to do all along. Federal law and the BEACON study protocol required that Jasper (i) only select qualified experts to act as investigators, and (ii) only admit patients with a clear medical history of CSU. Investors, who had been misled by Jasper, mistakenly believed Defendants had been following federal law and the BEACON study protocol all along as they were required to.

23.    Significantly, Jasper knew that the January 2025 amendment to the BEACON protocol for cohorts 8 and 9 made it more likely that patients misdiagnosed with CSU might be admitted to the BEACON study.

24.    Cohorts 1-7 of the BEACON study included only patients that had tried, but not been cured by, the drug omalizumab. Cohorts 8 and 9 permitted inclusion of patients who never tried omalizumab (*aka* omalizumab naïve). Omalizumab is typically only prescribed by specialists. Accordingly, by permitting patients that were omalizumab-naïve, the amendment to the BEACON study was more likely to include patients that had not seen a specialist. Since specialists are less likely to misdiagnose CSU than non-specialists, amending the BEACON protocol to include patients not seen by specialists was, as Defendants knew, likely to increase the odds of misdiagnosed patients being enrolled in cohorts 8 and 9.

8

AMENDED CLASS ACTION COMPLAINT

25.     Jasper confirmed as much, but not until December 2, 2025, eleven months after announcing that the study design would be changed to include omalizumab-naïve patients. In response to an analyst question as to whether "there [was] any antihistamine levels or prior omalizumab response that you could add in your trial that would realistically tilt kind of the scales to ensure" that only patients with CSU were enrolled, Dr. Martin Metz, one of the principal investigators for the study, responded:

> I especially like the comment on previous omalizumab response, what this would tell you, regardless of whether that was a positive or a negative response from omalizumab. It will tell you that this patient has been seen by a specialist before because only a specialist would prescribe an omalizumab. So knowledge about this for a patient that was, for example, preferred, we'll provide information on the history of the disease. So ***the patient has a longstanding disease and has been seen by a specialist at the time. So this makes it more likely that the diagnosis is correct***.

26.     Dr. Metz's response thus made clear that the Company's decision to remove the omalizumab treatment requirement from the BEACON study increased the risk of enrolling patients whose CSU diagnosis was incorrect.

27.     Critically, Defendants not only failed to warn investors of the heightened risk of improper enrollment in cohorts 8 and 9 of the BEACON study, but Defendants blatantly misrepresented this heightened risk. On January 8, 2025, the same date that Jasper's stock price collapsed because the results of the 180 mg dose cohort of the BEACON study had been marred by the improper enrollment of 2 misdiagnosed patients, Defendants held a conference call, specifically addressed this investor concern, and assured investors that (i) such misdiagnosis "rarely happens," (ii) it was less likely to happen in omalizumab-naïve patients (cohorts 8-9) than omalizumab-refractory patients (cohorts 1-7), and (iii) the Company would follow its "inclusion/exclusion criteria" published in the protocol to properly enroll CSU patients.

28.     In truth, in their rush to add cohorts 8 and 9 and enroll patients to complete the BEACON study quickly and test higher doses, Defendants: (i) included study sites without any

9

AMENDED CLASS ACTION COMPLAINT

"certified Immunologist/Dermatologist with a history of diagnosing and treating CSU patients" and thus did not have, as FDA regulations require, "investigators qualified by training and experience as appropriate experts;" (ii) removed the requirement that patients first try omalizumab, *increasing* the risk of incorrect patient enrollment (not decreasing it, as Defendants falsely claimed); (iii) included patients without full medical histories contrary to the BEACON protocol, further increasing that risk; (iv) enrolled patients with "*minimal* documented medical history of CSU or past treatments for CSU" and thus did ***not*** have a CSU diagnosis for at least six months prior to enrollment (contrary to the published BEACON protocol).

29.     These facts contradicted Defendants' statements about the design of the BEACON study and their compliance with FDA regulations. Further, Defendants never informed investors that their decisions to permit unqualified study sites and remove the requirement that patients first attempt omalizumab materially increased the risk of enrolling patients without CSU, jeopardizing the study's ability to show efficacy and progress to the next stage of the IND process.

30.     On January 7, 2026, only a month after disclosing the results of its internal investigation, Jasper announced that it had terminated Defendant Martell's employment, replacing him as CEO with the Company's COO, who had "deep experience in therapeutic development," making clear that Martell's abrupt departure was directly related to the BEACON study.

31.     The Company's stock fell to $1.66 per share, a decline of over ***75%*** from its $6.77 closing price on July 3, 2025, the trading day immediately before Jasper disclosed "confounded" data in the BEACON study, and down over ***90***% from its $17.71 closing price on January 7, 2025, the day before Jasper released the BEACON 180mg dose data marred by two improperly enrolled patients. This action seeks to recover investor losses resulting from Defendants' misrepresentations about the Company's efforts to obtain FDA approval of briquilimab.

AMENDED CLASS ACTION COMPLAINT

## II.    JURISDICTION AND VENUE

32.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

33.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

34.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Jasper is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

35.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

36.    Plaintiffs, as set forth in their previously-filed Certifications (ECF Nos. 1, 8-2 and 15-5), acquired Jasper securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures and materialization of the misrepresented risks.

### B.    Defendants

37.    Defendant Jasper is a Delaware corporation with principal executive offices located at 2200 Bridge Pkwy, Suite #102, Redwood City, CA 94065. Jasper's common stock

11

AMENDED CLASS ACTION COMPLAINT

trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "JSPR."

38.    Defendant Martell was hired as Jasper's CEO and President in March 2022. Martell also joined the Board at that time. Martell remained in those positions until January 5, 2026, when he was terminated as CEO and President, which also resulted in his simultaneous departure from the Board.

39.    Defendant Cross was hired as Jasper's Chief Financial Officer and Corporate Secretary effective September 22, 2023. Cross remains in both of those positions.

40.    Defendant Tucker was appointed as Jasper's CMO on or about June 13, 2023. He served in that position until he departed the Company effective August 1, 2025.

41.    Defendants Martell, Cross, and Tucker are collectively referred to herein as the "Individual Defendants."

42.    The Individual Defendants possessed the power and authority to control the contents of Jasper's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Jasper's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Jasper, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

43.    Jasper and the Individual Defendants are collectively referred to herein as "Defendants."

12

AMENDED CLASS ACTION COMPLAINT

**C.      Relevant Non-Parties**

44.      FE-1 was a Senior Research Associate at Jasper from late 2022 until early June 2025, and worked out of the Company's sole lab, which was at its headquarters in California. FE-1 reported to Minyoung Yan, an Associate Director, who in turn reported to Hye-Sook Kwon, an Executive Director. Kwon reported to the Senior Vice President of Research, Wendy Pang. FE-1 was in a team that analyzed samples from patients in Jasper's clinical trials to identify biomarkers for potential future study.

45.      FE-2 was a clinical data manager from late 2024 until early June 2025, reporting to Eloisa Rodriguez, the Director of Clinical Data Management. Rodriguez, in turn, reported to Jinwei Yuan, the Executive Director, Head of Biometrics, who reported to Defendants Martell and Tucker. FE-2 prepared clinical trial data for use by different internal stakeholders and attended regular meetings regarding the studies to which FE-2 was assigned to, including the BEACON study. About once a month, Defendants Martell and Tucker joined these meetings to review the details of each study's progress.

46.      FE-3 was a Director of Project Management at Jasper from 2022 until early 2023. FE-3 was based in California and was directly involved in overseeing the Company's development of briquilimab for CSU, which later included the BEACON study.

47.      FE-4 was a senior member of Jasper's clinical development team from April 2024 until February 2025. FE-4 reported directly to Defendant Tucker and interacted with Defendant Martell as well.

48.      FE-5 was a Senior Associate Scientist at Jasper from mid-2022 until early June 2025, working out of the Company's lab at its headquarters in California. FE-5 reported to Hye-Sook Kwon, who reported to Wendy Pang.

13

AMENDED CLASS ACTION COMPLAINT

IV. **SUBSTANTIVE ALLEGATIONS**

A. **Background**

49. In November 2019, Jasper entered into a worldwide exclusive license agreement with Amgen, Inc. ("Amgen") for briquilimab (formerly known as AMG-191 and JSP191) that also included translational science and materials from Stanford University (the "Amgen License Agreement"). The Company was assigned and accepted Amgen's rights and obligations, effective November 21, 2019, for the Investigator Sponsored Research Agreement (the "ISRA"), entered into in June 2013, between Amgen and The Board of Trustees of the Leland Stanford Junior University ("Stanford") and the Quality Agreement between Amgen and Stanford, effective as of October 7, 2015. Under the ISRA, the Company received an option to negotiate a definitive license with Stanford for rights to certain Stanford intellectual property related to the study of briquilimab in exchange for an option exercise fee of $1.0 million, payable over a two-year period (the "Option"). The Company exercised the Option on June 2, 2020. As a result, the Company acquired worldwide exclusive rights to develop and commercialize briquilimab.

50. Jasper went public in September 2021 via its acquisition by Amplitude Healthcare Acquisition Corporation, a special purpose acquisition company ("SPAC").

51. On January 10, 2023, Jasper announced that

as part of an overall portfolio prioritization, that the Company will focus on the development of its lead product candidate, briquilimab (formerly known as JSP191), in chronic diseases and stem cell transplant for rare diseases. This portfolio includes a new program on chronic urticaria, along with the Company's existing programs for lower-risk myelodysplastic syndrome (MDS), sickle cell disease, Fanconi anemia and severe combined immunodeficiency (SCID).

Based on preclinical and clinical studies showing inhibition of c-Kit signaling, depletion of mast cells in skin and lung and extended pharmacokinetics of subcutaneous dosing, the Company has prioritized rapidly starting a clinical study in severe chronic urticaria.

14

AMENDED CLASS ACTION COMPLAINT

### B.    Chronic Spontaneous Urticaria

52.    Chronic spontaneous urticaria, or CSU, is a mast cell-mediated skin disease. Mast cells are immune cells found in connective tissue throughout the body and contain chemicals such as histamine, heparin, cytokines, and growth factors. By releasing such chemicals, mast cells play an important role in inducing inflammatory cascade, which is an immune mechanism often triggered by injury, pathogens, or toxic stimuli. The chemicals released by mast cells have many effects, including flushing and itching. In most patients, CSU is associated with IgE (Immunoglobulin E) and/or IgG (Immunoglobulin G) mast cell-activating autoantibodies.

53.    CSU is characterized by daily or almost daily symptoms such as itchy hives or wheals occurring without an identifiable trigger (hence, spontaneous) and lasting for more than six weeks (hence, chronic). It can significantly impair patients' quality of life and is associated with sleep disturbances and psychiatric conditions including depression and anxiety. CSU typically persists for 2–5 years before resolving on its own. In up to 30% of patients, however, it can last for many years or even decades.

54.    Fortunately, for most patients, CSU can be effectively treated with the FDA-approved drug therapy. The first line of treatment is second-generation H1 antihistamines, either at approved dosages or up to four times the dosage if necessary. Antihistamines counteract the effects of histamine that is released from activated mast cells. If this is not sufficiently effective, the second line treatment is omalizumab. Omalizumab is the first anti-IgE monoclonal antibody. It is designed to reduce IgE, which is thought to trigger mast cell activation. The vast majority of patients with CSU achieve complete or substantial control of their symptoms with this standard treatment approach.

AMENDED CLASS ACTION COMPLAINT

55.     CSU's prevalence in the US adult population has been estimated as 0.12%. With an adult population in the US of approximately 267 million, this yields a population of CSU-affected adults of approximately 320,000.

56.     Defendants themselves estimated that approximately 2.1 million patients were treated for CSU across all G6 nations, that approximately 40% of those patients (or 850,000) are not well-controlled with antihistamines, and that, of those patients, approximately 13% of biologic-eligible patients receive omalizumab, of which approximately one-third have an inadequate response. This yields approximately 37,000 potential patients in G6 nations, as illustrated by the following slide in a presentation that Defendants filed with the SEC on June 2, 2023:



57.     Proper diagnosis of CSU can be difficult for those not experienced with CSU. One scientific paper reported that 19% of primary care physicians (non-experts in CSU) who evaluate patients presenting with chronic wheals report difficulties diagnosing CSU, and 33% report difficulties with differential diagnosis, i.e., identifying CSU by differentiating from other

conditions with similar symptoms. Non-responsiveness to antihistamines or omalizumab is a "red flag" requiring the consideration of alternative diagnoses.

58.    Proper diagnosis of CSU is not difficult for experienced doctors who are qualified by training as appropriate experts with CSU (as was required by 21 CFR § 312.53 of investigators in the BEACON study). According to an article authored by one of the principle investigators on the BEACON study, Dr. Martin Metz, titled "The Diagnostic Workup in Chronic Spontaneous Urticaria – What to Test and Why," the diagnosis of CSU is relatively straightforward: "Confirming the diagnosis of CSU is the most important aim of the diagnostic workup. ***In most cases, this diagnosis is easily established by the history and the presence of CSU-defining clinical signs and symptoms***, that is, spontaneously recurring pruritic wheals, angioedema, or both for longer than 6 weeks."

**C.    Jasper Prioritizes Briquilimab for CSU**

59.    Briquilimab, in Defendants' words, is

a monoclonal antibody designed to block stem cell factor ('SCF') from binding to and signaling through the CD117 receptor on mast and stem cells. The SCF/CD117 pathway is a survival signal for mast and stem cells and we believe that blocking this pathway may lead to depletion of these cells from skin and bone marrow environments.

60.    As noted above, in January 2023, Defendants stated that they would prioritize studying briquilimab for severe chronic urticaria. That same month, the Company conducted a secondary offering of 69 million shares of its common stock (plus an underwriter option to purchase up to 9 million additional shares), with gross proceeds of approximately $103.5 million.

61.    Jasper's 2022 10-K stated that

Based on preclinical and human healthy volunteer clinical data showing that briquilimab can deplete mast cells from the skin, we believe that briquilimab could

17

AMENDED CLASS ACTION COMPLAINT

be effective therapy for CSU patients. We intend to study briquilimab monotherapy in CSU patients who are refractory to anti-histamine therapy.[4]

62.     The Company's March 8, 2023 Form 8-K quoted Defendant Martell as follows:

"The fourth quarter of 2022 and recent weeks have been a transformational period for Jasper, during which we announced expansion of briquilimab development to include chronic spontaneous urticaria and secured substantial additional capital to execute on our development plan across the briquilimab franchise." said Ronald Martell, President and Chief Executive Officer of Jasper. "*By focusing on well-characterized opportunities in chronic mast cell diseases* and stem cell transplant for rare diseases, *we have established clear, and potentially fast, pathways to market*. With the substantial resources we obtained through our public offering in January 2023, *we are positioned to move rapidly into a clinical trial in chronic severe urticaria* and to initiate our chronic lower-risk MDS study, while continuing recruitment in the SCID, Fanconi Anemia and sickle cell disease transplant studies."

63.     Three months later, on June 2, 2023, Defendants announced to investors that

the Company recently met with the U.S. Food and Drug Administration (the "FDA"), which provided the Company with valuable guidance and feedback regarding the Company's proposed program for briquilimab for the treatment of Chronic Spontaneous Urticaria ("CSU"). As a result of the feedback received from the FDA, the Company currently expects to file its investigational new drug application ("IND") for briquilimab for the treatment of CSU, and dose the first patient in the study, in the second half of 2023.

**D.      Relevant Aspects of and Requirements for the IND Process**

   *i.      IND Process*

64.     FDA approval is required before marketing a new pharmaceutical drug in the United States. Securing such approval requires submitting an application to the FDA; the applicant (usually the manufacturer or potential marketer) is also referred to as the "sponsor." During a new drug's early preclinical development, the sponsor's primary goal is to determine if the product is reasonably safe for initial use in humans, and if the compound exhibits pharmacological activity that justifies commercial development. When a product is identified as

---

[4] "Refractory" refers to conditions that do not respond to treatment or become resistant to treatment over time.

18

a viable candidate for further development, the sponsor then focuses on collecting the data and information necessary to establish that the product will not expose humans to unreasonable risks when used in limited, early-stage clinical studies.

65.    The FDA's role in the development of a new drug begins when the drug's sponsor, having screened the new molecule for pharmacological activity and acute toxicity potential in animals, intends to test its diagnostic or therapeutic potential in humans. At that point, the molecule changes in legal status under the Federal Food, Drug, and Cosmetic Act and becomes a new drug subject to specific requirements of the drug regulatory system.

66.    The sponsor (Jasper in this case) then must file an Investigational New Drug (IND) application with the FDA. Among other things, the sponsor must file a detailed protocol with the FDA that is published on the website www.clinicaltrials.gov. As described by the FDA, an IND application must include:

> Clinical Protocols and Investigator Information - Detailed protocols for proposed clinical studies to assess whether the initial-phase trials will expose subjects to unnecessary risks. Also, information on the qualifications of clinical investigators--professionals (generally physicians) who oversee the administration of the experimental compound--to assess whether they are qualified to fulfill their clinical trial duties. Finally, commitments to obtain informed consent from the research subjects, to obtain review of the study by an institutional review board (IRB), and to adhere to the investigational new drug regulations.

67.    The IND application process is governed by numerous federal regulations, including 21 CFR § 312. As detailed herein, unbeknownst to investors, Jasper violated federal regulations governing the selection and publication of the investigators selected to participate in the BEACON study.

### ii.    Phases of Studies

68.    Per FDA regulations, the clinical investigation of a previously untested drug is generally divided into three phases, which are generally conducted sequentially. 21 CFR § 312.21. Phase 1 includes the initial introduction of the investigational new drug into humans.

19

21 CFR § 312.21(a)(1). Phase 1 studies "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." *Id*. FDA regulations state that the "total number of subjects and patients included in Phase 1 studies varies with the drug, but is generally in the range of 20 to 80." 21 CFR § 312.21(a)(2).

69.    In Phase 1a trials, participants are given single ascending doses of the drug or treatment being studies. The patient is monitored for side effects after receiving the first dose. If none are established, those participants receive a higher dose. Phase 1b trials involve several groups of participants, each receiving different doses. This offers a faster method of testing different dosages because multiple dosages are tested at the same time.

70.    Phase 2 studies include "controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug." 21 CFR § 312.21(b). "Phase 2 studies are typically well controlled, closely monitored, and conducted in a relatively small number of patients, usually involving no more than several hundred subjects." *Id.*

71.    Phase 2a trials are designed to gather and assess data about dosing requirements, that is, to establish optimal dosing for efficacy and safety. Phase 2b trials are intended to determine the efficacy of the drug or treatment at a specified dose. Drug sponsors may combine phase 1 and 2 studies in order to answer research questions more quickly and/or with fewer patients.

72.    If phase 1 and 2 studies are successful, the sponsor can move to phase 3 studies, which are "expanded controlled and uncontrolled trials." 21 CFR § 312.21(c). "They are performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and

20

AMENDED CLASS ACTION COMPLAINT

are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.* Phase 3 studies usually include from several hundred to several thousand subjects. *Id.*

### iii.    Requirements for Investigators

73.    The FDA imposes strict regulations on clinical trials for new drug applications, including IND applications. These include regulations regarding the credentials and responsibilities of investigators. The sponsor (Jasper in this case) of the application is responsible for selecting qualified investigators (21 CFR § 312.50) and must "select *only* investigators *qualified by training and experience as appropriate **experts*** to investigate the drug." 21 CFR § 312.53(a).

74.    FDA regulations for IND applications provide that "investigator" refers to "an individual who actually conducts a clinical investigation (*i.e.*, under whose immediate direction the drug is administered or dispensed to a subject)." Thus, this refers to the doctors at individual study sites who are responsible for directing the administration or dispensation of the drug being studied.

75.    Before permitting an investigator to participate in a study, the sponsor must obtain their "curriculum vitae or other statement of qualifications of the investigator showing the education, training, and experience that qualifies the investigator as an expert in the clinical investigation of the drug for the use under investigation." 21 CFR § 312.53(c)(2).

76.    Further, before permitting an investigator to participate, the sponsor must obtain an investigator's completed and signed Form FDA 1572, which requires the investigator to identify their credentials qualifying them as an expert, identify "any medical school, hospital, or

21

AMENDED CLASS ACTION COMPLAINT

other research facility where the clinical investigation(s) will be conducted," and identify "any clinical laboratory facilities to be used in the study." 21 CFR § 312.53(c)(1).

77.    The sponsor must "monitor the progress of all clinical investigations being conducted under its IND." 21 CFR § 312.56(a).

78.    Finally, the sponsor must publicly identify in the published protocol very specific "facility information" for each investigator selected to participate in the study pursuant to 42 CFR § 11.10(b)(31) and 42 CFR § 11.28(a)(2)(iii)(C).

### E.    Jasper's BEACON Study of Briquilimab for CSU

79.    As noted above, Defendants announced on June 2, 2023, that "[a]s a result of feedback received from the FDA," they expected to file an IND for briquilimab for the treatment of CSU, and dose the first patient in the study, in the second half of 2023. At that time, the study was expected to enroll both patients with inadequate responses to omalizumab (aka Xolair) (i.e., omalizumab-failed patients), as well as patients who had never been started on omalizumab (or omalizumab-naïve patients), as reflected in the following slide from the Company's presentation filed with the SEC on June 2, 2023:

Potential initial clinical study for Briquilimab in Chronic Spontaneous Urticaria

| | Chronic Spontaneous Urticaria (CSU) |
|---|---|
| Patient Population | • H1-antihistamines refractory<br>• Xolair-naïve and/or Xolair-failed |
| Expected Enrollment | • 20-40 patients |
| Study Duration | • 12-18 months |
| Timing | • Incorporating recent FDA guidance on study design<br>• Targeting 2H IND and Study Start |
| Trial Design | • Randomized, Placebo-Controlled<br>• Test multiple ascending doses/frequencies<br>• 12-week activity assessment with potential study expansion |
| Endpoints | • PK/PD<br>• Safety and tolerability<br>• Urticaria Activity Score (UAS7)<br>• Itch Severity Score (ISS7)<br>• Hives Severity Score (HSS7)<br>• Angioedema Activity Score (ASS7) |

Briquilimab is an investigative drug and is not approved for any indication

22

AMENDED CLASS ACTION COMPLAINT

80.     On August 11, 2023, Defendant Martell informed investors that during the second quarter of 2023, Jasper "continued [its] preparations to begin a study in chronic spontaneous urticaria, which we anticipate initiating in the coming months."

81.     Then, on October 9, 2023, Defendants issued a press release announcing "that [Jasper's] investigational new drug (IND) application for a Phase 1b/2a repeat dose clinical study of subcutaneous briquilimab in the treatment of CSU has been cleared by the U.S. Food and Drug Administration." The press release quoted Defendant Martell as stating that "[c]learance of the IND for the CSU study is a critical milestone for Jasper, which represents the first step in building out our pipeline with a focus on treating mast cell diseases with briquilimab."

82.     According to the press release:

The Phase 1b/2a study in CSU is a dose escalation study evaluating repeat doses of subcutaneous briquilimab in adult CSU patients *who remain symptomatic after treatment with, or who cannot tolerate omalizumab*. The study is expected to enroll approximately 40 patients across 6 cohorts and the primary endpoints will be safety and tolerability of briquilimab with secondary endpoints focused on efficacy measures and pharmacokinetics. The study will be conducted at sites in the US and EU and Jasper is expecting to enroll the first patient by the end of 2023 and to be able to report data from early cohorts by mid-2024.

83.     The press release, which was filed with the SEC as an attachment to a Form 8-K, quoted Defendant Tucker as follows:

The clearance to proceed by the FDA for our IND allows us to move quickly to commence our CSU study in patients who are ineligible for, or refractory to, omalizumab, which is a patient population of high unmet need. We expect this dose escalation study to provide proof of concept for the depletion of mast cells by briquilimab as a differentiated mechanism of action in CSU *and to help identify optimal doses and dosing regimens for future registrational studies in the broader CSU patient population*.

84.     Defendants also held an "KOL Webinar" on October 11, 2023, with Martell, Tucker, and members of Jasper's expert panel presenting to analysts. During the call, Defendants explained the goal, objectives, and design of the BEACON study.

AMENDED CLASS ACTION COMPLAINT

85.     The *single* "Study Goal" was to "identify the optimal therapeutic doses & dosing frequency of subcutaneous briquilimab to inform future registrational trials," as shown in this slide from the presentation given that day:

## Briquilimab Phase 1b/2a in patients with Chronic Spontaneous Urticaria (CSU)

**Study Goal:** identify the optimal therapeutic doses & dosing frequency of subcutaneous briquilimab to inform future registrational trials

**Key Objectives:**
• Study multiple briquilimab dose levels, and intervals ranging from 4 to 12+ weeks to study the effects of:
  • Mast cell depletion and disease symptom/disease modifications
  • Briquilimab drug clearance
  • Time to return of disease symptoms
  • Briquilimab on other c-Kit expressing cell lineages

• Part 1 intended to identify the minimally effective dose

• Treat the highest unmet need population for clearest efficacy signal

**Status: IND cleared (US), CTA submitted (EU), with FPI targeted by year-end 2023**

JASPER THERAPEUTICS

Briquilimab is an investigative drug and is not approved for any indication

15

86.     As shown in the following slide, which was presented at the October 11, 2023 KOL Webinar, the study design called for six cohorts with 38 patients in total. To be eligible to enroll, patients must (1) have had a diagnosis of CSU for at least six months, (2) have a UAS7 score at least 16, (3) be at least eighteen years old, (4) have failed to achieve an adequate response to H1 antihistamines, and (5) have failed to achieve an adequate response to omalizumab. Each cohort would receive a different dose and dosing schedule. As shown by the slide, the first two cohorts (in Part 1 in the slide) would not be placebo-controlled; the other cohorts would be. Those first two cohorts would receive 10 and 40 mg doses, respectively, at intervals of 4 weeks and then 8 weeks. Patients in the Part 2 cohorts would receive doses of 80 mg, 120 mg, and 180 mg, at intervals of 8 weeks and 12 weeks. Finally, the single cohort in Part 3 would receive a single administration of 240 mg with a 36-week follow-up to assess mast cell recovery.

24



87.     Thus, Defendants designed the BEACON study to include only patients who both failed H1 antihistamines and had an "[i]nadequate response to omalizumab."

88.     Also as shown by the above slide, the "key assessments" for the study were UAS7 scores, UCT scores, mast cell depletion and recovery (as measured by the presence of serum tryptase,[5] skin biopsies to measure the presence of mast cells, and skin prick tests to measure the skin's response to codeine). The safety of the doses given in the study, measured by the occurrence of treatment-emergent adverse events and serious adverse advents, was also a key assessment.

89.     During that October 11, 2023 call, an analyst asked Defendant Martell whether "when you operationalize, you know, later stage studies, any synergies between the CSU sites and potentially the chronic inducible urticaria sites?" In response, Martell stated: "Absolutely. Synergies between CSU and CIndU site, *these are largely the same centers both in Europe and*

---

[5] A patient's blood is drawn to measure serum tryptase levels, which may be used as a marker of mast cell activity. Tryptase is a serine protease released by mast cells.

AMENDED CLASS ACTION COMPLAINT

*US that treat these patients.*" This communicated to investors that the sites used in the BEACON study were "centers" with experience treating either CSU and CIndU, and *most* of them ("largely") were experienced with *both* CSU and CIndU

90. According to FE-1, the FDA approved the BEACON study with strict eligibility requirements that inclusion was limited to patients who failed omalizumab treatment because omalizumab was the industry standard. Thus, as a matter of patient protection, "if the patient could be successfully treated with omalizumab, then they shouldn't be enrolled on an experimental drug." FE-1 added, "There's no need for them to use an experimental drug if they find success with [omalizumab.]" This was constantly communicated to FE-1 internally at Jasper.

91. The following month, on November 30, 2023, the Company revealed that the study was named BEACON and

> that the first patient has been dosed in Jasper's phase 1b/2a clinical study of subcutaneous briquilimab for the treatment of CSU called BEACON (a phase 1b/2a **B**riquilimab dose **E**scalation trial assessing **AC**tivity, safety, and pharmac**O**kinetics i**N** adult patients with chronic spontaneous urticaria). The BEACON study is evaluating repeat doses of subcutaneous briquilimab in adult CSU patients who remain symptomatic after treatment with, or who cannot tolerate, omalizumab.

92. According to Defendant Tucker, as he was quoted in Jasper's November 30, 2023 press release:

> In addition to gathering safety data in CSU patients who are ineligible for, or refractory to, omalizumab, we expect the study to establish proof of concept for the depletion of mast cells by briquilimab in CSU. ***Results from the trial should also allow us to determine doses and dosing regimens for future registrational studies in the broader CSU patient population.*** We look forward to providing enrollment updates as we progress through the cohorts and anticipate reporting preliminary data in mid-2024.

93. Defendant Martell emphasized that they were moving rapidly, stating that "[t]reating the first patient so shortly after IND clearance is a testament to the hard work and diligence that Ed and his team put into the BEACON study's launch."

AMENDED CLASS ACTION COMPLAINT

94.    Unbeknownst to investors, these statements were misleading. Defendants were pushing a timeline they could not achieve and included undisclosed risks. The BEACON trial protocol, as it existed at the time of these statements, included only patients who had failed or could not take omalizumab. The BEACON trial, which was enrolling only the small subset of CSU patients who could not be treated by antihistamines or omalizumab, could not be sufficient to determine doses and dosing regimens for a registrational study in the broader CSU patient population that was omalizumab-naïve.

95.    To conduct a registrational study in the broader CSU population, Jasper would have to amend the BEACON protocol to add additional cohorts of patients who were omalizumab naïve. As Defendants knew, amending the BEACON protocol to add more cohorts would add both delay and risk to the timeline that Jasper set forth to investors. Defendants continued to push this misleading timeline. During a January 9, 2024 presentation, Defendants represented that the BEACON study set the stage for the Phase 2b/3 stage of the program to begin in the second half of 2025, as shown by the following slide:



AMENDED CLASS ACTION COMPLAINT

96.     Jasper did in fact raise financing shortly after issuing the November 30, 2023 press release and the January 9, 2024 presentation touting the timeline for moving into a registrational study of briquilimab. On February 6, 2024, Jasper issued a press release announcing it had sold 3,900,000 shares to the public at an offering price of $12.95 per share, raising $50 million. The proceeds were to be used to fund "development programs of briquilimab." Jasper's prospectus did not disclose that Jasper would need to include additional cohorts in the BEACON trial or that the addition of those later cohorts carried substantial risk and delay to obtaining FDA approval of briquilimab.

97.     On February 13, 2024, at the Oppenheimer Healthcare Life Sciences Conference, Defendant Martell assured investors "our current working plan is that we should be on schedule for this year and should we hit the end points that we look to, that we could be in a registrational clinical trial in the second half of 2025." Martell further noted that while the current "clinical trial is only patients who are oma-experienced. Those patients that have the highest unmet medical need. A registrational trial will take all-comers unmet medical need, our registrational trial we'll take all comers to it."[6]

98.     Defendants would continue to misleadingly push this timeline throughout 2024 and early 2025.

99.     On October 15, 2024, Defendants announced that Jasper "expects to report initial data from all cohorts of the BEACON study in CSU during the week of January 6th, 2025, including the recently added 180mg Q8W dose cohort."

100.    The next month, on November 7, 2024, Defendants announced that they had obtained "regulatory clearance in the US and the EU to further expand the BEACON study in

---

[6] Defendants and analysts at times referred to omalizumab as simply "oma."

28

AMENDED CLASS ACTION COMPLAINT

CSU by adding a 360mg single-dose cohort (n=4)." Per Defendants, patient enrollment in that cohort had already been completed, and data was expected to be reported in the first half of 2025. The results of this latest 360mg single-dose cohort would not be ready for the initial BEACON data update to be given during the week of January 6, 2025.

101.    Defendants also announced on November 7, 2024 that they had commenced "an open-label extension study in chronic urticarias that will roll over patients from the BEACON and SPOTLIGHT studies upon completion of their initial follow up period."[7] An "open label" study is a non-blinded study; both the health providers and the patients are aware of the drug or treatment being given. An "extension" study is a follow-up clinical trial where participants from a completed "parent" trial continue to receive the drug being studied. This allows the collection of data regarding the long-term safety, tolerability, and effectiveness of the drug.

**F.    Defendants Face Pressure to Make Quick Progress, Enroll More Patients, and Test Higher Doses of Briquilimab**

102.    Defendants' emphasis on rapidly securing FDA approval to market briquilimab for CSU reflected two critical circumstances. *First*, as a development-stage company, Jasper generated no revenue and thus relied on raising capital from investors. The Company incurred $64.5 million in net losses in 2023, and $71.3 million in 2024, and disclosed that "[w]e will need to raise additional financing to continue our products' development for the foreseeable future, and will continue to need to do so until we become profitable." Indeed, Jasper acknowledged that it "has incurred significant losses and negative cash flows from operations *since its inception* that raise substantial doubt about its ability to continue as a going concern."

103.    *Second*, Jasper was also in a race to market with other products in development, in particular barzolvolimab, an investigational drug which was being developed by Celldex

---

[7] The SPOTLIGHT study was a Phase 1b/2a study of briquilimab for CIndU.

Therapeutics, Inc. ("Celldex"), and which showed significant promise for treating mast-cell driven diseases. Defendants identified Celldex as its primary competitor in the CSU market, and recognized that Jasper's "commercial opportunity could be reduced or eliminated if [its] competitors develop and commercialize product candidates that are safer, more effective, have fewer or less severe side effects, are more convenient or are less expensive than our product candidates or that would render our product candidates obsolete or non-competitive." FE-1 reported that Celldex was "one of the major competitors" as it was "in a similar sphere" and was also targeting the CSU indication. FE-5, a Senior Associate Scientist at Jasper from mid-2022 until early June 2025, corroborated this, stating that at Jasper, Celldex's product barzolvolimab was considered the "benchmark," and that the Company manufactured a compound similar to barzolvolimab (which it could not obtain because it was not yet on the market) in order to conduct internal studies comparing that compound to briquilimab.

104.    FE-1 reported that Celldex and barzolvolimab were discussed during all-hands meetings, and that senior leadership would discuss data released by Celldex in order to explain the decisions they were making with respect to briquilimab for CSU. In fact, when Jasper sent a team to a World Health Organization conference in February or early March of 2025, where Celldex also was presenting data at a poster session, Jasper senior management encouraged the Jasper employees attending the conference to scope out Celldex's materials to see what data they presented and the progress of their studies, according to FE-1.

105.    Defendants repeatedly acknowledged the significance of Celldex as a competitor. When Defendants announced on June 2, 2023 that they expected to file the IND for briquilimab for CSU in the second half of 2023, they acknowledged – as investors were already well aware – that in Celldex's Phase 1b study, barzolvolimab showed efficacy in CSU patients. And, during

30

AMENDED CLASS ACTION COMPLAINT

the Company's presentation at the Oppenheimer Healthcare Life Sciences Conference on February 13, 2024 call, Defendant Martell began his remarks by stating

> In 2023, we really set the stage strategically and operationally to launch us into 2024, where in 2023, we announced that we would be strategically reprioritizing the company on masts and stem cells, mast cells rather, and specifically in chronic spontaneous urticaria and inducible urticaria. And we announced at the beginning of this year that [sic] We announced at the beginning of this year that those trials are open in the US and the EU and we're enrolling actively for those trials and have highlighted that we anticipate initial clinical data from the CSU clinical trial mid this year. *So the high anticipation for the data that we know that the investment community would like to have to compare directly to Celldex with similarly designed clinical trials, patient populations, endpoints.* So we're really looking forward to turning over the data card from this clinical trial in midyear.

106.    Similarly, during the November 30, 2023 Piper Sandler Healthcare Conference, one of Jasper's presenters (which, on information and belief, was Defendant Martell) noted, with respect to the BEACON study, that "[a]nd this study, specifically, when we started having internal discussions and conversations with the agency, it was critical to us that not only did we need to produce data from this study and design it so that we could demonstrate how we could compare against Celldex."

107.    Moreover, Celldex was farther along in the FDA approval process for barzolvolimab than Jasper was with briquilimab. The Company acknowledged that it faced the risk that its competitors, including Celldex, "may obtain FDA or other regulatory approval for their product candidates more rapidly than we may obtain approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market."

108.    *In addition*, the Company faced pressure to enroll more patients in the BEACON study. First, a greater sample size yields more robust results, as investors were aware. For instance, when the Company released initial data on January 8, 2025, an Oppenheimer analyst report stated that "investors see the data as mixed—partly due to the small patient numbers." Second, and more specifically, a larger sample size would be more likely to mitigate the negative

31

AMENDED CLASS ACTION COMPLAINT

impact of patients who did not respond to briquilimab, including because they did not in fact have CSU, as Defendants later acknowledged. FE-5 reported that when the January 2025 readout was announced internally (which was likely done by Defendant Martell, and that either Martell or Tucker typically presented data updates internally), leadership acknowledged that the strength of the data was undermined by the fact that the "N was low." There simply weren't enough patients to draw strong conclusions from the data. FE-5 recalled that, during the meeting, the need for Jasper to enroll additional patients in the BEACON study was discussed.

109.    *Lastly*, Defendants faced pressure from investors to test higher doses of briquilimab for CSU. FE-1 reported that there was pressure on Jasper from investors to test higher dosages because Celldex had done so. During the Company's October 11, 2023 KOL Webinar, an analyst asked Defendant Martell:

> Any inclination as to do you think that you will hit the highest dose of 250 milligrams, 240 milligrams? Do you think there's a potential you might even be able to go higher than that? Or do you need to go higher than that? And, obviously, that's sort of a speculative question.
>
> And sort of also how do you sort of look at your doses that you're studying relative to the barzo dosing, right? Because, obviously, barzo is also running a subcu[taneous] study in Phase 2. I mean, is there anything – is there any way to translate the dosing at this point? Obviously, it's very early.

110.    In response, Defendant Martell stated that

> one of the key differences here we see between their program and ours is really the objective of our clinical trial, and it goes to the heart of your question, is that we're approaching this from an optimum biologic dosing standpoint.
>
> Currently, Celldex is taking a very linear approach to their dosing, classic dosing schedule and we understand why they did it. But again, at the top of my remarks, you know, Jasper leads with the biology and we think it's critical to – and hopefully, you've understood this morning that explore the doses that it takes to deplete the mast cell. And then, equally as important, the timing of the dose and the amount once those mast cells start to return. And so, we think that that is critical for both the efficacy and the safety for the development of briquilimab.
>
> And lastly, I think as it relates to your question about the 280 milligram, we certainly think we will have efficacious doses below the 280 milligram. We're

32

largely exploring the 280 milligram. Maybe, if you could think about it in more sort of an induction type of a dose, if you will, that certainly from all of our early data, as well as the barzo data, *we think with briquilimab potency that we will be able to deplete the mast cells and have durability of that response deplete the mast cells and have durability of that response at the doses below 280. And that's why we see the 280, there is not a second dose that's contemplated because we're looking at more sort of an induction type of strategy there*.

111.    According to FE-1, who learned this information through all-hands meetings and/or their superior, though Jasper leadership initially believed that lower doses were sufficient, and thus it was not necessary to test higher doses, the Company belatedly changed course in order to placate investors. After all, the Company relied on the investment community to fund its operations for an unknown period of time until it could commercialize a product. However, this pivot to include later doses was late in the trial, in late 2024 or early 2025. This is consistent with the Company's November 7, 2024 announcement that it had obtained "regulatory clearance in the US and the EU to further expand the BEACON study in CSU by adding a 360mg single-dose cohort (n=4); patient enrollment in this cohort has completed," and "[d]ata from the recently added 360mg single-dose cohort is expected to be reported later in the first half of 2025," but would not be ready for the initial data update in early January 2025. Thus, once Defendants decided to add more patients, they were under pressure to do so quickly so as not to delay the progress of the BEACON study and the commencement of a registrational study for briquilimab in CSU.

**G.      In Violation of FDA Regulations, Defendants Remove Information about the BEACON Study Sites from ClinicalTrials.gov**

112.    Section 801 of the Food and Drug Administration Amendments Act of 2007 ("FDAAA 801") requires the responsible party for an applicable clinical trial ("ACT") to register the trial on ClinicalTrials.gov. A trial conducted under an IND application is an ACT. 42 CFR § 11.10. For the BEACON study, Jasper was the responsible party, according to the information it

submitted to ClinicalTrials.gov for the BEACON study.[8] FDA regulations required Jasper to submit specific information, including "Facility Information," which means, "for each participating facility in a clinical trial," the "Facility Name, meaning the full name of the organization where the clinical trial is being conducted," and "Facility Location, including city, state, country and zip code for U.S. locations (including territories of the United States) and city and country for locations in other countries." 42 CFR § 11.10(b)(31); 42 CFR § 11.28(a)(2)(iii)(C). In addition, "Facility Information" includes either

(A) For each facility participating in a clinical trial, Facility Contact, including the name or title, telephone number, and email address of a person to whom questions concerning the trial and enrollment at that site can be addressed; or

(B) Central Contact Person, including the name or title, toll-free telephone number, and email address of a person to whom questions concerning enrollment at any location of the trial can be addressed.

113.    When Jasper first registered the BEACON study on ClinicalTrials.gov, it disclosed the required information, providing the name and location of the sole facility included in the study at that time, as well as the name, telephone number, and email address of a person at the facility.

| Location | • **Little Rock, Arkansas, United States, 72205** |
| --- | --- |
| | Status: **Recruiting** |
| | Facility: Little Rock Allergy & Asthma Clinical Research Center |
| | Contact: ○ Contact |
| | ▪ Mindy DeMarco, RN,BSN,CCRP |
| | ▪ 501-224-1157, 7 |
| | ▪ mdemarco@littlerockallergy.com |

114.    As the study progressed, Jasper amended the protocol three separate times in January, February, and March 2024, and submitted the required information for other study sites to ClinicalTrials.gov. However, on May 15, 2024, Jasper removed *all* site names and replaced

---

[8] https://clinicaltrials.gov/study/NCT06162728

34

them with site numbers that it used internally (except for the Little Rock site listed above). For instance, the "South FL Research Clinic" in Miami, Florida became "Site 113":

- **Miami, Florida, United States, 33165**
  Status:        **Recruiting**
  Facility:        ~~South FL Research Clinic~~ Site 113

115.    Beginning at that time, new sites were identified only by city, state, and zip code (and Jasper's internal site numbering not known to the public), as in this example:

- **Spring**field, Illinois, United States, 61761
  Status:        Recruiting
  Facility:        Site 124

116.    Thus, after the fifth amendment to the BEACON protocol on May 15, 2024, Defendants concealed the names of facilities and investigators newly added to the BEACON study.

117.    The sixth, seventh, eighth, and ninth versions of the protocol continued to conceal the Facility Information for each site and investigator selected by Jasper to participate in the BEACON trial. This is a clear violation of 42 CFR § 11.10(b)(31) and 42 CFR § 11.28(a)(2)(iii)(C).

118.    By refusing to disclose the Facility Information (including location name or any contact information), as required by federal regulations, Defendants were able to conceal from investors that Jasper had, in its rush to enroll patients, chosen unqualified facilities and investigators to participate in the BEACON trial.

119.    In addition, FDA regulations required the BEACON protocol to include a Central Contact Person. Jasper listed Defendant Tucker as that person for the first seven versions of the published BEACON protocol. When Jasper amended the protocol for the eighth time on January 31, 2025, to include the pivotal cohorts 7 and 8, which ultimately included misdiagnosed CSU

35

AMENDED CLASS ACTION COMPLAINT

patients, Defendant Tucker was no longer listed as the central contact person and his name was replaced with a generic reference to "Medical Director" as shown below.[9]

120.    Jasper has not disclosed that it has a "Medical Director" title nor any person bearing that title.

121.    By contrast, Jasper's competitor Celldex provided the required Facility Information on the ClinicalTrials.gov page for a study of barzolvolimab, as shown by the following excerpt:

---

[9] Despite this change, the fact that Defendant Tucker was originally listed as the Central Contact Person for the BEACON study contributes to a strong inference of his scienter.

36

AMENDED CLASS ACTION COMPLAINT

**Alabama Locations**

⬤ **Cullman, Alabama, United States, 35058**
   **Recruiting**
   Allervie Clinical Research - Cullman
   Contact :  Heather Nisley
              205-209-4101  hnisley@allervie.com

**Arizona Locations**

⬤ **Litchfield Park, Arizona, United States, 85340**
   **Recruiting**
   Research Solutions of Arizona PC
   Contact :  Jorge Quesada Aguilera
              623-512-4340  jqa@researchsolutionsaz.com

⬤ **Scottsdale, Arizona, United States, 85258**
   **Recruiting**
   Medical Research of Arizona a division of Allergy, Asthma, & Immunology, Assoc. Ltd.
   Contact :  Ciara Thomas
              ciara@medicalresearchaz.com

⬤ **Scottsdale, Arizona, United States, 85260**
   **Recruiting**
   Center for Dermatology & Plastic Surgery
   Contact :  Stephen Fuller
              stephenfuller@cctresearch.com

122.    Thus, Jasper not only chose unqualified investigators and facilities to participate in the enrollment of patients in the BEACON trial, but also concealed the Facility Information that FDA regulations require to be published on the FDA's website, which information could have revealed to investors (and others) that Jasper had cut corners in violation of federal law in an effort to catch up with Celldex and enroll more patients.

**H.    Defendants Tout Initial Data from the BEACON Study; The Market Reaction is Not As Positive**

123.    On January 8, 2025, Defendants announced "positive preliminary data from Jasper's ongoing BEACON Phase 1b/2a study of subcutaneous briquilimab in adult participants with CSU." These initial results, as noted above, did not include the 360mg single-dose cohort referenced in Defendants' November 7, 2024 announcement.

37

AMENDED CLASS ACTION COMPLAINT

124.    Defendants' January 8, 2025 press release quoted Dr. Casale as stating: "I am excited to see the preliminary clinical data which demonstrated that treatment with briquilimab led to rapid and durable symptom control in patients with CSU, *especially* given the omalizumab-experienced population enrolled in the BEACON study."

125.    Defendants noted that patients enrolled in the BEACON study had "moderate to severe CSU and were omalizumab experienced," and emphasized that the "[c]linical responses in this hard-to-treat population are encouraging for a broader CSU population."

126.    Defendants also reminded investors that Jasper's "[r]egistrational program in CSU expected to commence second half of 2025."

127.    Defendants announced, however, that before that registrational program would begin, the Company would enroll patients into two new cohorts "of 240mg Q8W and 240mg induction dose followed by 180 Q8W," as reflected in the slide below from the investor call that Defendants held that same day:



Efficacy, safety and PK informs an optimal biologic dose selection for briquilimab CSU registrational program expected to be initiated in 2H 2025

- Briquilimab was well tolerated and had a favorable safety profile in the study
  - Low and comparable frequency of Grade 1 hair color changes – in both active and placebo
  - Mild taste changes observed on first dose with majority resolving by a median of 31 days
  - No dose delays or discontinuations due to neutrophil reductions and no association with infection
    - Neutrophil recovery between doses
  - Single discontinuation due to AE
- Registrational program in CSU expected to commence second half of 2025
  - Deep and durable efficacy to 240mg dose, combined with the favorable safety profile observed support advancing into Phase 2b portion of a registrational program
- Ongoing trials continue to generate clinical data to support registrational program
  - Expansion of 240mg and 360mg single dose cohorts ongoing
  - Additional cohorts of 240mg Q8W and 240mg induction dose followed by 180mg Q8W
  - Additional 180mg Q8W data from BEACON and SPOTLIGHT Open Label Extension study
  - These data will further inform final dose selection for the Phase 2b portion of our registrational program



Briquilimab is an investigative drug and is not approved for any indication

38

AMENDED CLASS ACTION COMPLAINT

128.    In that January 8, 2025 investor call, Defendant Martell told analysts that "[r]esults of these cohorts are expected by midyear 2025 and will support a well-informed data-driven decision in consultation with regulatory authorities regarding which doses and regimens to bring forward." Similarly, Martell emphasized that "once we conclude the dosing of 240 milligram as a Q8 week and a 240 milligram induction followed by the 180 milligram[,] that will really inform us about what a subsequent dose might look like here."

129.    The addition of these two cohorts reflected the necessity to test omalizumab-naïve patients in the BEACON study before being able to conduct a registrational study on the broader CSU population, as well as investor pressure for Defendants to increase the study's sample size and test higher doses. Defendants represented that the decisions to add two new cohorts and eliminate the omalizumab requirement were simply ways to get more data and "inform" the decision of what dose to study in future trials. Defendants never explained, or even mentioned, the risks presented by these decisions, nor those presented by the addition of unqualified study sites.

130.    During the investor call, Defendant Tucker explained that these results for patients "refractory to all available and approved therapies" (i.e., antihistamines and omalizumab), "bodes very well for a broader population of patients, not only those that are oma experienced and failed oma patients, but also a broader population of patients as well who are oma naïve. And we'd like to explore that in our registrational program." Thus, Defendants intended to include a "broader population" of omalizumab-naïve patients in the registrational program for briquilimab in CSU.

131.    Accordingly, Defendant Martell disclosed that for the two "additional cohorts of 240mg Q8W and 240mg induction dose followed by 180mg Q8W," Jasper "would look to enroll both oma-naïve and oma-experienced patients." Martell did not disclose that this change to the patient eligibility criteria increased the risk of enrolling patients without CSU, nor that testing

39

omalizumab-naïve patients was necessary to support a registrational study for the broader population (including omalizumab-naïve patients) for which Jasper sought FDA approval.

132.    Not all of the data released was "positive," as Defendants touted. Though certain cohorts showed excellent results, the critical 180 mg dose arm of the study underperformed. In fact, the 120 mg dose cohort had a greater response to briquilimab than the 180 mg cohort. The poor test results in the 180 mg dose arm injected uncertainty and delay into the strict timeline Jasper needed to meet to be able to compete with Celldex. Investors and analysts were keenly focused on the poor results in the 180mg dose. Analysts pressed Defendants on the issue during the January 8, 2025 call, with one asking:

> But on other metrics, the 120 milligram arm outperformed the 180 milligram arm and you touched on this in the call but any more color you can provide here? I mean, I guess is this just noise given the tryptase data?

133.    Defendant Tucker's response attributed the poor results for the 180 mg cohort to the inclusion in that cohort of two patients who had been misdiagnosed as having CSU. Tucker stated:

> I alluded to this in my presentation that we did see, I think fantastic dose responses from a biology perspective. And we also looked at our PK, so everything behaved, *but we saw two patients that potentially have an alternative diagnosis*. *And in small numbers in these cohorts, it can significantly impact the rates as we show for a well-controlled and complete responses*.

134.    In light of this, analysts asked directly about whether the enrollment of misdiagnosed CSU patients would cause more problems as Jasper continued the BEACON study. For example, later in the call on January 8, 2025, an analyst inquired about the steps taken by Jasper to prevent the enrollment of patients who did not have CSU, asking whether Jasper had taken "any efforts to mitigate the differential diagnoses during screening moving forward? If you have any strategies to ensure that the patients have urticaria."

40

AMENDED CLASS ACTION COMPLAINT

135.    In response, Defendant Tucker assured investors that this issue "rarely happens" and that Jasper's BEACON protocol for inclusion/exclusion criteria gave him confidence the Company could properly enroll only true CSU afflicted patients. Defendant Tucker stated:

> Yeah. I mean, *it's certainly a challenge for ensuring that all patients included in a clinical study are our target population. Now, we are subject to small numbers in these cohorts, and so one or two patients can certainly have a dramatic effect on your study.* As we move through into our registrational program, those studies will be much larger and so can accommodate single and small numbers of patients who may not actually have the appropriate diagnosis. Sometimes this happens when we talk to our KOLs. That diagnosis can be a misdiagnosis for CSU. *It rarely happens.*
>
> But *in a patient population that is refractory to omalizumab, I think we probably enriched for that* potential to occur in our study. In the future studies we will continue with our inclusion/exclusion criteria and I think *we can maintain a population of CSU patients* that is representative of the broader population in the community.

136.    When another analyst later asked a question "trying to understand" how the 180mg cohort had included misdiagnosed CSU patients," Defendant Tucker responded that Jasper would ensure proper diagnosis in the future and that the prior cohorts, because they were omalizumab refractory, were more likely to be misdiagnosed.:

> Yeah. Again, *I think we're hostage to small n[umber]s and certainly we'll be taking a look at the 180 milligram Q12 week similarly for ensuring diagnosis.* As I mentioned earlier, this is an enriched population of patients who are refractory to approved therapies. And so we potentially have brought patients in who potentially may have been diagnosed. *That's certainly something which we discussed with all our KOLs, and that was certainly something that pointed to immediately on seeing the 180 milligram data, particularly when we see the biological effects with the tryptase going down to below LLOQ.*

137.    Despite these conversations that Defendants had "with all our KOLs" regarding the potential to enroll patients without CSU, they failed to disclose that opening the study to omalizumab-naïve patients heightened the risk of enrolling patients without CSU. Further, Defendants did not disclose that they were adding unqualified investigators and sites to the

41

BEACON study to speed up patient enrollment, which further heightened the risk of enrolling patients without CSU.

138.    Approximately two months later, on March 1, 2025, Defendants Martell and Tucker, and Dr. Martin Metz, presented regarding BEACON study results at the annual meeting of the American Academy of Allergy, Asthma, and Immunology ("AAAAI"). During his remarks, Dr. Metz addressed the issue, first disclosed on January 8, 2025, that the 180 mg cohort showed a lesser response to briquilimab than the 120 mg cohort. Dr. Metz explained:

> This is sensitivity analysis, meaning that two patients were excluded from this and there was a reason to do that. Because ***these two patients, they were in the 180, both were in the 180 mg Q8 cohort and they had—they did show a complete reduction in tryptase, so their mast cells were gone, but the symptoms were still there. So this tells us that these patients were most likely not CSU patients because you can't have both signs and symptoms without having mast cells***. We can discuss this also later. There are differential diagnoses, mostly likely urticaria vasculitis. Super rare possibility also of inflammatory disease. I doubt that this is the case but urticaria vasculitis is something that can be a confounder.

139.    Defendants did not disclose to investors that they had selected investigators who were not qualified by training and experience as experts to participate in the BEACON trial, and capable of following the BEACON trial protocol to enroll only those patients meeting the enrollment criteria, nor that the risks of enrolling improperly diagnosed CSU patients would be heightened in BEACON cohorts 8 and 9. Defendants misled investors about the risks of removing the requirement that patients first try and fail omalizumab, which Defendants only later acknowledged increased the risk of enrolling patients who did not even have CSU. Defendants failed to warn investors of this fact despite acknowledging the enrollment of misdiagnosed CSU patients in the 180mg cohort had already adversely affected Jasper's timeline for obtaining FDA approval of briquilimab.

140.    Dr. Metz also presented the following slide comparing changes in UAS7 scores at week 12 of studies of five drugs, including briquilimab:

42



141.    Later in the call, an analyst asked

A question about the omalizumab experience. Would you consider these to be omalizumab experienced or inadequate responders, or nonresponders? *How did you define that in the Phase 2 study, and how do you look at it going forward in the next stage trials?* Also, if you have any input from payers, either in the U.S. or overseas.

142.    Defendant Tucker began his response by stating that "the vast majority of patients who are motivated to come into our trial must have experienced omalizumab before coming. That was an entry criteria." Tucker explained that that included "those that simply don't get a response at all or it's very, very delayed," as well as "patients who have essentially had I would say minimal improvements in their UAS7." Tucker did not discuss the fact that removing the omalizumab requirement heightened the risk of enrolling patients without CSU; indeed, he did not discuss that change in the study design at all.

143.    Defendant Martell added that "for the additional cohorts that we're adding here for BEACON, we're now enrolling oma-naïve patients as well," but he did not warn investors of

43

the risks presented by the changes to the BEACON study design and the addition of unqualified study sites.

144.    Defendants failed to note these risks even as they emphasized the importance of additional cohorts 8 and 9. When an analyst asked "What is your latest thinking regarding dose selection moving forward in development? And how do you view your data in light of the competitive landscape?," Defendant Tucker's response noted that

> BEACON is going to be extremely informing for us, ***especially with the extra data that we're generating from the latter cohorts***, *which fill in the exposure response and the PK analysis which were ongoing and we'll have again more fulsome data from these higher dose cohorts*.

145.    Defendant Martell also emphasized the importance of the data from Cohorts 8 and 9, stating that "[w]e really look forward to the mid-year data when we have enough of a cohort," meaning more data from more patients.

146.    Throughout the first half of 2025, Defendants continued to misrepresent and conceal the risks associated with the cohorts 8 and 9 of the BEACON study, including Defendants' choice to disregard federal regulations in selecting investigators and the enrollment of patients with only "minimal" CSU documentation. Further, Defendants spoke about the change to the enrollment criteria for cohorts 8 and 9 without disclosing that this heightened risk of improperly enrolling patients without CSU.

147.    For example, on March 1, 2025, Defendants spoke at the American Academy of Allergy, Asthma, and Immunology (AAAAI) Annual Meeting. Defendants' answers to the final analyst question during this call explained why Defendants removed the omalizumab requirement from the BEACON study. The analyst asked: "What was the rationale for adding omalizumab-naïve patients to the additional cohorts in BEACON? Can we assume that that change will go forward to future studies?"

148.    Defendant Martell stated that "[i]t *absolutely* will go forward into future studies."

44

AMENDED CLASS ACTION COMPLAINT

149. Dr. Metz then added:

*Yes, it needs to. Because if you go into studies leading to Phase 3 studies and if you then only go for oma non-responders, well, this is your population that you're dealing with, and then you can only get it approved for patients that are oma non-responders. This is not what we want to have. So, you need to be able to show that you have efficacy over all of these patients and then you have a drug for all of these patients.* That would certainly be my advice that you should not—I mean it makes sense at this point to look at these oma non-responders because it's the most severe patient population and you get them also faster recruited into these trials, but at some point you have to show that it works in CSU in all of these patients.

150. Thus, Jasper *had* to include "omalizumab-naïve patients [in] the additional cohorts in BEACON" because without testing briquilimab in such patients, "you can only get it approved for patients that are oma non-responders," which would drastically limit the market for briquilimab to treat CSU.

151. Defendant Tucker added:

I would just add two comments there as well to Pete's question. Thanks, Pete, for asking. The first is I think *it's scientifically the right thing to do to study both populations, both the oma naïve and also the oma treated. The data we've shown here today is in the oma experienced that have been refractory. This is the toughest population, so we anticipate good responses in the oma-naïve.* Barzolvolimab didn't see a difference and I think to Martin's earlier comment we don't anticipate because *if we're defeating the mast cell, it doesn't really matter what the history of the omalizumab therapy was.*

Then the second is, which is more from an operational perspective, *finding oma-naïve patients is much easier than finding oma refractory patients. There's more of them, so we can anticipate that our recruitment enrollment into the study can go a little faster.* So, we're quite upbeat about achieving the enrollment goals that we've set ourselves in these cohorts.

152. Tucker thus represented that the study would progress more quickly by including omalizumab-naïve patients, while omitting any mention of the heightened patient selection risks—and resulting delay—posed by that change to the design of the BEACON study.

AMENDED CLASS ACTION COMPLAINT

I.     **Defendants Disclose "Confounded" Results in the BEACON Study, Defendant Tucker's Departure, and Cost-Cutting Measures**

153.    On July 7, 2025, the Company issued a press release entitled "Jasper Therapeutics Reports Clinical Data Update from Briquilimab Studies in Chronic Spontaneous Urticaria." The press release stated, in relevant part:

> Jasper [. . .] is reporting updated data from Company's BEACON Phase 1b/2a study of subcutaneous briquilimab in adult participants with CSU and providing an update on the program. Briquilimab administration resulted in deep and rapid disease control in the 240mg and 360mg single-dose cohorts, with 8 of 9 (89%) of participants enrolled across both cohorts achieving a complete response, and with 7 of 9 (78%) achieving a clinical response by week 2. In addition, BEACON participants who rolled over into the open-label extension study dosing at 180mg Q8W demonstrated robust clinical efficacy with 8 of 11 (73%) participants achieving a complete response at 12 weeks.
>
> ***Results from the 240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts appear to be confounded by an issue with one drug product lot used in those cohorts, with 10 of the 13 patients dosed with drug from the lot in question. The Company is investigating the drug product lot in question and expects to have the results of that investigation in the coming weeks. Key observations noted in those 10 patients were lower than expected drops in mean tryptase levels and no discernable impact on UAS7 scores. The 2 participants enrolled in the cohorts that have been confirmed as being dosed with drug product from a different lot both achieved complete response***.
>
> ***
>
> ***The Company has also determined that the drug product lot in question was used to treat participants enrolled in the ETESIAN trial evaluating briquilimab in asthma. As a result, and in order to focus resources on advancing briquilimab in CSU, the Company is halting the study and pausing development in asthma. In addition, the Company is halting development in SCID and will be implementing a number of other cost cutting measures, including a potential restructuring, to extend runway and reduce expenses***.
>
> "We were pleased that results from the 240mg and 360mg single dose cohorts continue to indicate that briquilimab treatment can lead to deep and durable disease control in patients with CSU," said [Defendant] Martell[.] "We are also very excited by the performance of the 180mg Q8W dose in the open label extension study with the strong efficacy observed, in combination with the encouraging safety data, supporting a differentiated profile. While we are very disappointed by the confounded results seen in the two multi-dose cohorts of the BEACON study, we are currently investigating the cause and are taking steps to ensure that drug product from the lot in question is returned to the Company and that sites have drug product

46

from other lots to continue dosing. We plan to enroll an additional 10-12 patients across the two impacted cohorts to inform final dose selection for the Phase 2b study, *and will be implementing a number of cost cutting measures to reduce burn and extend our cash runway in light of this delay*."

154.    In response to this news, Jasper's stock price fell 55.1%, closing at $3.04 per share on July 7, 2025.

155.    Market analysts were quick to comment on the Company's announcement. For example, on July 7, 2025, BMO Capital Markets published a report entitled "Downgrade to Mkt; Manuf Issue Adds High Uncertainty to an Already Ambiguous Story." The BMO Report stated, in relevant part:

**Bottom Line:**
Management update on Briquilimab's CSU trial includes: (1) 240mg/360mg single-dose data suggesting plateauing exposure/efficacy; (2) 240mg and 240mg/180mg Q8W efficacy/safety data, likely confounded by product lot issues; (3) Preliminary 180mg Q8W OLE data, in line with blinded data. Although the new data appear somewhat encouraging, *the potential manufacturing issue, and underlying uncertainty/questions, make it challenging to separate the signal from the noise. Given the market environment and previous setback here, we believe investors won't feel comfortable coming back to the story following today's update*. Downgrading to Market Perform, PT to $4.

\*\*\*

**The use of lot A34954 Briquilimab material challenges assessments of efficacy/ safety profile in 240mg and 240mg/180mg Q8W cohorts**. Lot A34954 material shows lack of efficacy on UAS7 (N=10) *following Briquilimab 240mg single-dose vs. 88% CR (N=7/8) with other lots, preventing clear assessment of the drug effect. Similarly, Briquilimab safety evaluation is challenged by the inclusion of lot A34954-treated patients*. We await further updates on lot A34954 in the coming weeks.

\*\*\*

**We downgrade JSPR to Market Perform to reflect high uncertainty around Briquilimab development**. *Although today's data appear somewhat encouraging, we believe potential Briquilimab drug lot issues, coupled with existing uncertainty around dose-response [], will pressure the JSPR story moving forward given: (1) JSPR's financing overhang (runway to 4Q25), wherein 240mg and 240mg/180mg Q8W data are now expected by 4Q25; (2) Development delays vs. competitor CLDX (CSU PhIII enrollment completion by summer 2026) and competition from SNY following BPMC acquisition []; (3) Market's high sensitivity (and low tolerance) around ambiguous updates*[.]

47

156.    Two days later, on July 9, 2025, the Company issued a press entitled "Jasper Therapeutics Announces Corporate Reorganization and Other Cost Cutting Measures to Extend Cash Runway." The press release stated, in relevant part:

> Jasper [. . .] today announced a corporate reorganization to extend its cash runway, *including a workforce reduction of approximately 50%. As part of the reorganization, [Defendant] Tucker[] is departing as Jasper's [CMO]*, and Daniel Adelman, M.D., a member of Jasper's Scientific Advisory Board, will assume the role of Acting [CMO]. *In order to focus resources on the development of briquilimab in chronic urticaria, Jasper is halting its other clinical and preclinical programs*.
>
> ***
>
> **Corporate Updates and Revised Guidance**
>
> - Jasper has refined its operating plan to focus on its briquilimab programs in chronic urticaria, *and as a result has executed a workforce reduction of approximately 50% of its current employees*.
>
> - In order to focus on developing briquilimab in chronic urticaria and completing the BEACON, SPOTLIGHT and open label extension studies, Jasper is *halting its other clinical and preclinical programs, including the ETESIAN study in asthma, the SCID study and the ongoing investigator-sponsored studies. Jasper no longer plans to initiate additional mast cell focused clinical development program this year*.
>
> - *[Defendant] Tucker is departing his role as [CMO] effective August 1, 2025*. Dr. Daniel Adelman, an experienced clinical development executive and member of Jasper's scientific advisory board, will assume the role of Acting [CMO] as of that date.

157.    Citizens JMP Securities, in an analyst report, emphasized that it was "likely the most important cohort remaining in the BEACON CSU trial [that was] largely disrupted by a presumed impaired drug lot," indicating the importance of Cohorts 8 and 9. The report also noted that "[b]y our calculations, the new (10-12) patients will need to be enrolled before September in order to have complete 12-week data by the end of 4Q25. Management indicated that because sites are up and running, rapid enrollment before that deadline is possible."

48

AMENDED CLASS ACTION COMPLAINT

158.    An analyst report from H.C. Wainwright & Co. noted that "[t]he company will also not be initiating any additional clinical programs this year. We view this as a logical decision given the ETESIAN trial was impacted by the inactive drug lot and also the company is now 3-6 months behind its original guidance for initiating the Phase 2b trial in CSU."

**J.    Jasper's Disclosures Regarding Its Investigation Into the Lack of Efficacy Shown in Cohorts 8 and 9**

159.    On September 18, 2025, Jasper announced that "[b]ased on the work conducted to date, the Company believes the anomalous efficacy results in these two cohorts do not appear to be related to drug substance ('DS') or drug product ('DP') manufacturing or distribution processes." The Company stated that

the ongoing investigation is now focused on clinical site activity, including:

- patient selection and enrollment processes

- investigational product handling and administration at the site level

- drug delivery methods (for example, injection site, needle and injection media); and

- additional patient- and site-level data review.

160.    Thus, Defendants disclosed that the cause of the "anomalous" results released on July 7, 2025 were not due to issues with one of the product lots of briquilimab used in the study. The Company told investors that it "continues to expect to complete the investigation in the fourth quarter of 2025."

161.    An analyst report from Citizens JMP Securities called it "a negative . . . that the issue has not been identified to date," and observed that "[i]f the issue is driven by patient enrollment, the data will continue to be 'messy' due to small patient numbers," leaving "little room for error" in the Company's efforts to overcome the negative results from Cohorts 8 and 9.

162.    On November 10, 2025, Jasper filed a Form 8-K quoting Defendant Martell as stating:

> Our investigation into anomalous efficacy results observed in the 240mg Q8W and the 240mg/180mg Q8W cohorts of the BEACON study is nearing completion, and we are encouraged by the determination that the results seen in these two cohorts do not appear to be related to any issues with drug substance or drug product. We plan to complete the investigation and report final conclusions in the fourth quarter of this year. We also plan to report initial data from the ETESIAN study in allergic asthma in the fourth quarter and now plan to report data from additional patients enrolled in the BEACON study, along with updated data from CSU and CIndU patients enrolled in the open-label extension study, in the first half of the first quarter of 2026.

163.    Then, on December 2, 2025, before the market opened, Jasper

announced the completion of its internal investigation into the anomalous lack of clinical response observed in the July 2025 BEACON data for cohort 8 (240mg Q8W) and cohort 9 (240mg /180mg Q8W), where no US patients (n=10) achieved Complete Response or Well Controlled UAS7 by week 12. Based on the work completed, the additional data from subsequent dosing of the US patients and input from a panel of CSU KOLs, ***Jasper has concluded that the unexpected efficacy results*** observed in the US patients was not the result of any issues with the drug product. Rather, it was ***likely a result of patient selection issues, as it appears that 9 of the 10 patients in question did not have CSU as their symptoms were not mast cell-driven***.

164.    During an investor call that day, Defendants disclosed that "one new site [in the BEACON study] enrolled 5 patients into active arms of Cohort 8 & 9 with no CR or WC responses,"[10] that that new site was a "[c]ommunity-based, clinical research center," and that "*[a]ll patients had **minimal** documented medical history of CSU or past treatments for CSU*." Further, Defendants disclosed that their "KOL panel" of experts recommended that Jasper ensure that it only used sites with "a certified Immunologist/Dermatologist with a history of diagnosing and treating CSU patients," revealing that Defendants were not already taking this step.

165.    The Company's stock fell 8.14% in response to this news.

---

[10] "CR" means "Complete Response" and "WC" means "Well Controlled." Per Defendants, CR refers to a UAS7 score of zero, and WC refers to a UAS7 score of six or less.

50

**K.      Jasper Terminates Defendant Martell's Employment**

166.    On January 7, 2026, after market hours, Jasper announced that five days prior, on January 2, the Board had terminated Defendant Martell's employment with the Company, which also automatically terminated his membership on the Board. The Company announced that, effective January 5, 2026, Martell had been replaced by Jeet Mahal, the Company's Chief Operating Officer. Jasper's announcement quoted Thomas Wiggans, the Chairperson of the Board, as stating that "Jeet's strategic vision and *deep experience in therapeutic development* make him an ideal person to drive value for our stockholders and, most importantly, for the patients we serve." This made clear to investors, though it was already clear from the timing, that Defendant Martell's abrupt termination as CEO was directly connected to his management of the Company's BEACON trial for briquilimab in CSU. This was reinforced during a conference call the next morning, when Mr. Mahal answered an analyst question about his appointment by stating that:

> this was a decision driven by the Jasper board, looking at the development stage of the company and the next stage of leadership needed to move the program forward into Phase 2b and pivotal studies. So the board asked that I become the CEO, given my track record in development of multiple therapeutics from Phase 1 or Phase 2 through BLA or NDA submission.

167.    Multiple analysts recognized the connection between Martell's departure (and Mahal's elevation) and the BEACON study. For instance, an RBC analyst report observed Mahal "has over 30 years of experience in life sciences" and that Jasper's "near-term focus will remain clinical execution, which will be key given recent stumbles and a potentially challenging path forward to catch barzo." H.C. Wainwright stated that replacing Martell with Mahal "signal[led] a pivot toward operational execution and registrational readiness for briquilimab."

168.    In response to this news, Jasper's stock price fell *19%* to close at $1.66 per share on January 8, 2026.

## V.    DEFENDANTS' CLASS PERIOD MISREPRESENTATIONS

169.    On November 30, 2023, Jasper issued a press release titled: "Jasper Announces First Patient Dosed in Phase 1b/2a Clinical Study of Briquilimab in Chronic Spontaneous Urticaria." The press release stated, in relevant part:

> The BEACON study is evaluating repeat doses of subcutaneous briquilimab in adult CSU patients *who remain symptomatic after treatment with, or who cannot tolerate, omalizumab.*

> "Dosing of the first patient in our BEACON study is an exciting milestone for Jasper as we advance the clinical development of briquilimab in mast cell diseases," said Edwin Tucker, Chief Medical Officer of Jasper. "In addition to gathering safety data in CSU patients who are ineligible for, or refractory to, omalizumab, *we expect the study to establish proof of concept for the depletion of mast cells by briquilimab in CSU. Results from the trial should also allow us to determine doses and dosing regimens for future registrational studies in the broader CSU patient population.* We look forward to providing enrollment updates as we progress through the cohorts and anticipate reporting preliminary data in mid-2024."

> The BEACON study is expected to enroll approximately 40 patients across 6 cohorts. The primary endpoints are safety and tolerability of briquilimab with secondary endpoints focused on efficacy measures and pharmacokinetics. The study is being conducted at sites in the US and EU. Jasper anticipates reporting preliminary data from the BEACON study in mid-2024. "We are pleased to announce that the first patient has been dosed in our BEACON study on a timeline *consistent with our prior guidance,*" said Ronald Martell, President and Chief Executive Officer of Jasper. "Treating the first patient so shortly after IND clearance is a testament to the hard work and diligence that Ed and his team put into the BEACON study's launch and I'm confident in the ability of our clinical organization to continue to execute at a high level as we advance briquilimab into clinical trials in CIndU and other mast cell-driven diseases."

170.    Defendants knew the statements referenced in the paragraph above were materially false and misleading. Defendants stated that "*Results from the trial should also allow us to determine doses and dosing regimens for future registrational studies in the broader CSU patient population.*" That statement was untrue at the time it was made because the data from the BEACON trial covering only CSU patients who could not be treated by antihistamines or omalizumab could not be sufficient to determine doses and dosing regimens for a registrational

52

AMENDED CLASS ACTION COMPLAINT

study in the broader CSU patient population that was omalizumab- and antihistamine-naïve. In November 2023, the BEACON study protocol included only patients who did not respond to antihistamines or omalizumab – representing a small subset of the CSU population (the Company itself estimated 37,000 CSU patients in G6 nations) versus the broader CSU population (which the Company estimated to be 2.1 million in G6 nations).

171.    As it then existed, the BEACON protocol could not support a registrational study of the broader CSU population. Jasper could not conduct a registrational study of briquilimab on the broader CSU patient population – *i.e.,* patients who were omalizumab-naïve – without first conducting a Phase 1b/2a study on patients who were omalizumab-naïve. To support a registrational study, the BEACON study would need to be amended.

172.    As FE-1 explained, the FDA approved the original BEACON protocol with strict eligibility requirements that inclusion was limited to patients who failed omalizumab treatment because, as a matter of patient protection, "if the patient could be successfully treated with omalizumab, then they shouldn't be enrolled on an experimental drug." FE-1 added, "There's no need for them to use an experimental drug if they find success with [omalizumab.]"

173.    Only after Jasper ran earlier cohorts demonstrating safety was Jasper able to amend the BEACON protocol to include cohorts 8 and 9, allowing for the enrollment of omalizumab naïve CSU patients.

174.     The first version of BEACON was published on December 7, 2023. Version 8 of the BEACON protocol was published on January 31, 2025, and was the first version of the BEACON protocol to include cohorts 8 and 9 that allowed for the enrollment of patients that were omalizumab-naïve.

175.    On March 1, 2025, Jasper presented at an American Academy of Allergy, Asthma & Immunology Investor Event on the BEACON study. Defendants Martell and Tucker admitted

53

AMENDED CLASS ACTION COMPLAINT

that the addition of cohorts 8 and 9 with omalizumab-naïve patients was necessary for the BEACON study to support moving forward with a registrational study of briquilimab in a broader portion of the CSU population. In response to an analyst asking "What was the rationale for adding omalizumab-naïve patients to the additional cohorts in BEACON? Can we assume that that change will go forward to future studies?," Defendants Martell and Tucker, and Dr. Metz, responded as follows:

**Ronald Martell**
It absolutely will go forward into future studies. Ed or Dr. Metz, want to talk about…

**Martin Metz**
*Yes, it needs to. Because if you go into studies leading to Phase 3 studies and if you then only go for oma non-responders, well, this is your population that you're dealing with, and then you can only get it approved for patients that are oma non-responders. This is not what we want to have. So, you need to be able to show that you have efficacy over all of these patients and then you have a drug for all of these patients*. That would certainly be my advice that you should not—I mean it makes sense at this point to look at these oma non-responders because it's the most severe patient population and you get them also faster recruited into these trials, but at some point you have to show that it works in CSU in all of these patients.

**Ed Tucker**
I would just add two comments there as well to Pete's question. Thanks, Pete, for asking. The first is I think *it's scientifically the right thing to do to study both populations, both the oma naïve and also the oma treated*. The data we've shown here today is in the oma experienced that have been refractory. This is the toughest population, so we anticipate good responses in the oma-naïve. Barzolvolimab didn't see a difference and I think to Martin's earlier comment we don't anticipate because if we're defeating the mast cell, it doesn't really matter what the history of the omalizumab therapy was.

Then the second is, which is more from an operational perspective, *finding oma-naïve patients is much easier than finding oma refractory patients. There's more of them, so we can anticipate that our recruitment enrollment into the study can go a little faster*. So, we're quite upbeat about achieving the enrollment goals that we've set ourselves in these cohorts.

176. Defendants, experts in the field and sponsors of the BEACON trial, would have known in November 2023 what they later admitted in March 2025, that the BEACON protocol as it was originally approved by the FDA and published excluded omalizumab-naïve patients and

54

AMENDED CLASS ACTION COMPLAINT

therefore could not support a registrational study of briquilimab for the broader CSU population (which includes omalizumab-naïve patients). Defendants, however, were motivated to conceal and downplay the necessity of the later added cohorts 8 and 9 before conducting a registrational study. Jasper needed funding. The appearance that Jasper was not far behind Celldex in developing a new CSU drug was critical to raising financing from investors.

177.    On January 9, 2024, Defendants presented and published a corporate presentation representing the Company's timeline to begin a registrational trial for CSU in the second half of 2025:



178.    On February 13, 2024, Jasper and Defendants Martell and Cross, along with head of Investor Relations Alex Gray, presented at the Oppenheimer Healthcare Life Sciences Conference. One of the Jasper speakers, which on information and belief was Defendant Martell, again misleadingly assured investors of the Company's timeline to get to a registrational clinical trial:

> Question: Great. Thank you for that additional color and I'm glad you mentioned
> moving quickly into a registrational trial. How quickly could you advance the CSU

program into a pivotal study assuming that your results are positive from your Phase 1/2?

Answer: So, our current working plan is that should we be on schedule for this year and should we hit the end points that we look to, *that we could be in a registrational clinical trial in the second half of 2025*.

179.    The Jasper speaker assured investors that Jasper intended to begin a 2025 registrational clinical trial of the broader CSU patient population, not just omalizumab-naïve patients. The speaker stated: "And as a reminder, our clinical trial is this first clinical trial is only enrolling patients who are oma-experienced. Those patients that have the highest unmet medical need. A registrational trial will take all-comers unmet medical need, *our registrational trial we'll take all comers to it*."

180.    When asked whether Jasper could "potentially move Briquilimab into earlier lines of treatment for CSU?," Defendant Martell responded:

We will certainly expect to and – I think I said it earlier but our registrational trial will take all comers on the naive as well as [oma] experience[d]. . . . So I think, you know, with what we've seen of how the rapid response that you see, then the durability of the response and the overall AE profile that *this sets itself up for an ideal first line therapy*.

181.    Jasper and Defendant Martell's public statements of a timeline for getting to a registrational clinical trial that included the larger CSU population (not just omalizumab-naïve patients) in 2025, and for briquilimab to serve as a first line treatment for the entire CSU population, was false and misleading. Defendants failed to disclose, as they would later admit, that the BEACON study would have to be amended and additional cohorts would need to be added to the BEACON study to support a registrational trial of the broader CSU population, and that these amendments and additional cohorts would add further risk and delay to the timeline for getting FDA approval.

182.    On April 8, 2024, Jasper and Defendant Martell presented at the Needham Healthcare Conference. Defendant Martell again reiterated the timeline for Jasper to move to a

56

registrational study in 2025, without disclosing the need to amend the BEACON study to include additional cohorts 8 and 9 that would add further delay and risk to this timeline. Martell stated:

> So, let's take a look at the BEACON study. Our first study in chronic spontaneous urticarial, it's a randomized, double-blind, placebo controlled ascending dose study. We will be enrolling patients who have had CSU for greater than six months, have mild to moderate CSU as evaluated by the UAS7 score of greater than or equal to 16. These will be adult patients, *and all of these patients will be of the highest unmet medical need. And by that, I mean they will have all failed H1-antihistamines and will have had an inadequate response to omalizumab*. This is the patient population that has the highest unmet medical need.
>
> Should be important to note *that if we are successful in this study and move forward with our registrational program, which if we're successful here, we would have planned to initiate in the second half of 2025, we would – in that study, we would enroll all comers*. So with patients that have failed antihistamines and patients who are omalizumab naïve, or have had an inadequate response to omalizumab.
>
> We're conducting this study in the US and the EU at approximately 30 sites. The lead investigators in the US are Tom Casale and in the EU is Dr. Marcus Maurer. We'll be enrolling about 38 patients in this study. In this study, the primary endpoint will be the UAS7 score at 12 weeks. And in addition to that, we'll be looking at correlations between serum tryptase and skin biopsies.
>
> This study, again, is designed as an ascending dose study with multiple cohorts. After reviewing and designing the study with both KOLs and the FDA, our objectives in this study were to design a study that really could interrogate optimal biologic dosing and, *if we're successful, enable us to move from this study to our registrational study.*

183.    Jasper and Defendant Martell's public statements regarding the timeline for getting to a registrational clinical trial that included the larger CSU population (including the larger population of omalizumab-naïve patients) in 2025, were false and misleading. Defendants failed to disclose, as they would later admit, that the BEACON study would have to be amended and additional cohorts would need to be added to the BEACON study to support a registrational trial of the broader CSU population, and that these amendments and additional cohorts would add further risk and delay to the timeline for getting FDA approval.

AMENDED CLASS ACTION COMPLAINT

184.    On August 13, 2024, Jasper issued a press release announcing the Company's Q2 2024 financial results. The press release stated, in relevant part:

> "*We have continued to make excellent progress advancing briquilimab during the second quarter, with patient enrollment proceeding faster than initially expected in the BEACON and SPOTLIGHT studies*," said [Defendant] Martell[.] "The strong rate of enrollment has given us the opportunity to include additional cohorts in our initial CSU data readout, and we are now planning to present results from dosing cohorts up to 240mg in the fourth quarter of this year. *While the company remains blinded to efficacy data from the study, rapid enrollment in BEACON has also given us the flexibility to expand the study to include an additional dosing cohort evaluating briquilimab at 180mg Q8W. This will enable us to generate a more robust dataset <u>to support dose selection for our planned registrational trials in CSU without impacting their timelines</u>*."
>
> "*We are very pleased with the progress in the BEACON and SPOTLIGHT studies thus far*," said [Defendant] Tucker[.] "With the support of our investigators, the efforts of the Jasper team and the timely review and approval by the Independent Data Monitoring Committee (IDMC) we have been able to quickly proceed through dose escalation on the BEACON study and are now enrolling patients at the highest dose, 240mg. *This rapid progress and safety affirmation by the IDMC has enabled expansion of the BEACON study to obtain more clinical insights into the potential benefits of briquilimab for patients with CSU, without delaying the program*. We look forward to reviewing and presenting initial data from both the BEACON and SPOTLIGHT studies later this year, followed in early 2025 by the full study reports to be presented at a medical conference."

185.    On September 20, 2024, Jasper presented at the TD Cowen Chronic Urticaria Summit. Defendant Martell again reiterated the Company's ability to move into a registrational trial for the broader CSU population, without detailing the need for, and risks of, conducting a trial on omalizumab-naïve patients.

> Yaron Werber (analyst):
>
> And so based on this data, and we're talking about cohorts that are anywhere between six patients, you know, the 120s or six patients, the 80s or eight, and the 180s or eight. You know, with all that data, you know, as you think about identifying a dose and moving forward, whether it's gonna be right into a phase 3 or into a phase 2/3, how do you... Kind of, what do you want to see to be able to go right into phase three, as opposed to going into another kind of a lead-in phase two, maybe when you're still comparing one or two doses or so, or two doses, and into phase three?
>
> Ronald Martell:

58

AMENDED CLASS ACTION COMPLAINT

I think the data will drive that. If we have a clear winner, then it makes that decision a bit easier, to you know, ***be able to absolutely pick a dose and move forward***. I think to your point, if we see two different doses that have similar efficacy, do we run those in a phase 2b, 3 adaptive design, such that you know, we can apply all those patients to the registrational trial and rapidly move forward? Those will be conversations we'll have with the agency soon. Ultimately, I mean, we're working on those designs now, and it'll be driven by the data.

186.    Contrary to Jasper and Defendant Martell's statements on August 13 and September 20, 2024, the Company could *not* conduct a registrational clinical trial that included the larger CSU population (including the larger population of omalizumab-naïve patients) without first amending the BEACON study to include additional cohorts. Cohorts with omalizumab-naïve patients would need to be added to the BEACON study to support a registrational trial of the broader CSU population, and these amendments and additional cohorts would add further risk and delay to the timeline for getting FDA approval, which Defendants knew but concealed from investors.

187.    On January 8, 2025, the Company issued a press release entitled "Jasper Therapeutics Reports Positive Data from BEACON Study of Briquilimab in Chronic Spontaneous Urticaria." The press release stated, in relevant part:

"We are very pleased to present the positive preliminary data from the BEACON study, which demonstrates the potential of briquilimab as a leading therapeutic for CSU patients," said [Defendant] Tucker[.] "The profound reduction in UAS7 from baseline in multiple cohorts, the dose dependent durability of response and the significant and prolonged drops in mean serum tryptase from baseline demonstrate the potential for deep and durable efficacy of briquilimab in CSU. ***Combined with the favorable safety profile enabled by our optimal biologic dosing approach, we believe briquilimab has demonstrated the potential to be a leading therapeutic option for patients with CSU***. On behalf of the entire Jasper team, I'd like to thank the investigators and the patients who are participating in the study, along with their families and caregivers."

188.    Defendants also held a conference call to discuss the data. In the call on January 8, 2025, an analyst asked about whether Jasper had taken any steps to ensure against the improper

AMENDED CLASS ACTION COMPLAINT

enrollment of patients, had Jasper taken "any efforts to mitigate the differential diagnoses during screening moving forward? If you have any strategies to ensure that the patients have urticaria."

189. In response, Defendant Tucker assured investors that this issue "rarely happens" and that Jasper's BEACON protocol for inclusion/exclusion criteria gave him confidence the Company could properly enroll only true CSU afflicted patients. Defendant Tucker stated:

Yeah. I mean, it's certainly a challenge for ensuring that all patients included in a clinical study are our target population. Now, we are subject to small numbers in these cohorts, and so one or two patients can certainly have a dramatic effect on your study. As we move through into our registrational program, those studies will be much larger and so can accommodate single and small numbers of patients who may not actually have the appropriate diagnosis. *Sometimes this happens when we talk to our KOLs. That diagnosis can be a misdiagnosis for CSU. It rarely happens*.

But *in a patient population that is refractory to omalizumab, I think we probably enriched for that* potential to occur in our study. In the future studies we will continue with our inclusion/exclusion criteria and I think *we can maintain a population of CSU patients* that is representative of the broader population in the community.

190. When another analyst later asked about the possibility that patients in the Q12W cohort had "any sort of alternative diagnosis," Defendant Tucker responded without disclosing that removing the omalizumab requirement for the two additional cohorts, and working with unqualified study sites, would increase the risk of enrolling patients without CSU, as follows:

Yeah. Again, *I think we're hostage to small n[umber]s and certainly we'll be taking a look at the 180 milligram Q12 week similarly for ensuring diagnosis*. As I mentioned earlier, this is an enriched population of patients who are refractory to approved therapies. And so we potentially have brought patients in who potentially may have been diagnosed. *That's certainly something which we discussed with all our KOLs, and that was certainly something that pointed to immediately on seeing the 180 milligram data, particularly when we see the biological effects with the tryptase going down to below LLOQ*.

191. Despite these conversations that Defendants had "with all our KOLs" regarding the potential to enroll patients without CSU, Defendants misrepresented the risk of enrolling misdiagnosed patients. While it is true that misdiagnoses of CSU by expert dermatologists and

immunologists may rarely happen, Defendants had selected unqualified investigators to participate in cohorts 8 and 9, thereby substantially raising the risk of such misdiagnoses. Further, as set forth in Jasper's corporate presentation delivered months later, on December 2, 2025, CSU misdiagnoses are "not uncommon as CSU is a diagnosis by exclusion, other CSU studies have shown 25-30% of patients are incorrectly diagnosed." Defendant Martell stated during an investor call on December 2, 2025 that "our analysis of data sets would suggest that 25-or-so percent of the patients probably that are currently diagnosed with CSU probably don't have that." Martell stated that "when you look at other clinical trials whether it's remi, dupi, barzo and their data, while they've never specifically spoken to non-responders, their data would imply that similar type of percentage."[11] In addition, Defendants did not disclose that the removal of the requirement that patients first try omalizumab materially increased the risk of enrolling patients who were wrongly diagnosed with CSU, as Dr. Metz acknowledged on December 2, 2025,

192. Further, Defendants misleadingly omitted to disclose that the Company was permitting patients into the BEACON study without a "full medical history," without "visual records of lesions," and was in fact accepting patients with "*minimal* documented medical history of CSU or past treatments for CSU," heightening the risk of including patients with incorrect diagnoses of CSU. Further, Defendants misleadingly omitted to disclose that the Company was selecting unqualified study sites that lacked any "certified Immunologist/Dermatologist with a history of diagnosing and treating CSU patients," and thus were especially likely to wrongly diagnose patients with CSU.

193. On the January 8, 2025 call, Defendants continued to mislead investors that Jasper could move directly into a Phase 3 study after the Phase 2b study, without disclosing the risks

---

[11] "Remi" and "dupi" refer to remibrutinib and dupilumab, two drugs that have been approved by the FDA to treat CSU.

AMENDED CLASS ACTION COMPLAINT

associated with cohorts 8 and 9 enrolling misdiagnosed CSU patients. For example, Defendant Martell said:

> And I think to your last point from a timing standpoint, that if we initiate this Phase 2b portion of the study in the second half of this year, it still would likely put us only 12-ish months behind [Celldex] in this arena, given that we would then only be taking one dose regimen forward into the Phase 3 portion of the registrational study. Ed, I'll turn it over to you.

194.    Defendant Tucker continued:

> So I think that what the BEACON provides us is a great deal of clinical data at various different doses and dosing regimens. And so that will inform, as Ron mentioned, the potential doses that we take through into the Phase 2b. And we also elaborated on our both our dose expansions and also the additional dose cohorts. So I think that we'll have a rich dataset to inform the Phase 2b *and the expectation is that we would take a single dosing regimen into our Phase 3 study*.

195.    At no time did Defendants disclose the heightened risk of enrolling misdiagnosed CSU patients in cohorts 8 and 9.

196.    On February 27, 2025, Jasper issued a press release (which it also filed as an attachment to a Form 8-K) announcing the Company's Q4 and full year 2024 financial results. The press release stated, in relevant part:

> "*The past year has been a transformational period for Jasper, highlighted by positive data readouts from the BEACON study in CSU and the SPOTLIGHT study in CIndU, our first two clinical studies evaluating Briquilimab in mast cell diseases*," said [Defendant] Martell[.] "*Data from both studies demonstrate the ability of briquilimab to drive rapid and deep response profiles in patients with chronic urticaria, along with the potential for a favorable and differentiated safety profile. We believe the preliminary results from the BEACON study support advancing briquilimab into a pivotal program in CSU beginning with an operationally adaptive Phase 2b study that we expect to commence later this year*. Final dose selection for the Phase 2b study will be further informed by a substantial array of additional clinical data at doses of 180mg and higher coming mid-year, including results from approximately 40 additional patients in the BEACON study and SPOTLIGHT study, as well as results from approximately 30 patients in the open-label extension study."

197.    The press release also included, among "Highlights for Fourth Quarter 2024 and Recent Weeks":

AMENDED CLASS ACTION COMPLAINT

- Obtained regulatory clearance to commence enrollment in the BEACON study cohorts evaluating 240mg Q8W and a 240mg loading dose followed by 180mg Q8W

  o Jasper expects to report data around mid-year 2025 from 4 cohorts: the 240mg single dose cohort (4 additional patients), 240mg Q8W cohort (8 patients), 240mg followed by 180mg Q8W cohort (8 patients), and the 360mg single dose cohort (8 patients).

198.    On March 1, 2025, at the AAAAI Annual Meeting, an analyst asked

A question about the omalizumab experience. Would you consider these to be omalizumab experienced or inadequate responders, or nonresponders? *How did you define that in the Phase 2 study, and how do you look at it going forward in the next stage trials?* Also, if you have any input from payers, either in the U.S. or overseas.

199.    In response, Defendant Martell stated:

Regarding your question for the regulatory authorities, we are in discussion with both EU and U.S. regulatory authorities, and we'll work with them in designing our registrational program, but I think *it's important to note that for the additional cohorts that we're adding here for BEACON, we're now enrolling oma-naïve patients as well*.

200.    Later during the March 1, 2025 presentation at the AAAAI Annual Meeting, Jasper's head of Investor Relations, Alex Gray, relayed an analyst question:

I have one more from Pete Stavropolous at Cantor Fitzgerald. What was the rationale for adding omalizumab-naïve patients to the additional cohorts in BEACON? Can we assume that that change will go forward to future studies?

201.    In response, Defendant Tucker stated:

I would just add two comments there as well to Pete's question. Thanks, Pete, for asking. The first is I think *it's scientifically the right thing to do to study both populations, both the oma naïve and also the oma treated*. *The data we've shown here today is in the oma experienced that have been refractory. This is the toughest population, so we anticipate good responses in the oma-naïve*. Barzolvolimab didn't see a difference and I think to Martin's earlier comment we don't anticipate because *if we're defeating the mast cell, it doesn't really matter what the history of the omalizumab therapy was*.

Then the second is, which is more from an operational perspective, *finding oma-naïve patients is much easier than finding oma refractory patients. There's more of them, so we can anticipate that our recruitment enrollment into the study can*

63

AMENDED CLASS ACTION COMPLAINT

*go a little faster*. So, we're quite upbeat about achieving the enrollment goals that we've set ourselves in these cohorts.

202.    Defendants Martell and Tucker's statements concerning the change to the BEACON eligibility criteria to permit omalizumab-naïve in cohorts 8 and 9 were materially false and misleading because they failed to disclose that cohorts 8 and 9, specifically, were subject to an especially high risk of including patients without CSU because the removal of the requirement that patients first try omalizumab materially increased the risk of enrolling patients who were wrongly diagnosed with CSU, as Dr. Metz acknowledged on December 2, 2025. On that day, an analyst asked:

> Maybe my first one a little bit of a follow up on an earlier question around how you can possibly ensure, enrollment of mast cell driven CSU patients as you scale up also with an eye on pivotal trial, right, in all these different geographies. What about the history per doctor like would you kind of like, how would you crack down on the referrals from outside clinics to centers? And is there any antihistamine levels or prior omalizumab response that you could add in your trial that would realistically tilt kind of the scales to ensure that?

203.    In response, Dr. Metz stated that

> So I especially like the comment on previous omalizumab response, what this would tell you, regardless of whether that was a positive or a negative response from omalizumab. It will tell you that this patient has been seen by a specialist before because only a specialist would prescribe an omalizumab. So knowledge about this for a patient that was, for example, preferred, we'll provide information on the history of the disease. So the patient has a longstanding disease and has been seen by a specialist at the time. So this makes it more likely that the diagnosis is correct.

204.    Dr. Metz further stated that the risk of an incorrect diagnosis of CSU can be decreased by "making sure that there is a good history indicating that someone who knows chronic spontaneous urticaria has seen patients before, one option would be a patient who was considered by omalizumab, for example." Thus, by removing the requirement that patients first be considered for omalizumab, Defendants increased the risk that the BEACON study would enroll patients that had not been seen by a specialist and had received an incorrect CSU diagnosis.

64

AMENDED CLASS ACTION COMPLAINT

205.    The significance of this omitted risk was further heightened because the Company was permitting patients into the BEACON study without a "full medical history," without "visual records of lesions," was in fact accepting patients with "*minimal* documented medical history of CSU or past treatments for CSU," and was selecting unqualified study sites that lacked any "certified Immunologist/Dermatologist with a history of diagnosing and treating CSU patients," and thus were especially likely to wrongly diagnose patients with CSU, which Martell and Tucker also failed to disclose.

206.    On March 27, 2025, Defendants Martell and Cross presented on behalf of Jasper at the H.C. Wainwright & Co. Autoimmune & Inflammatory Disease Virtual Conference. During the conference, an analyst asked, and Defendant Martell responded, as follows:

Question – Emily Bodnar: Okay. Great. And you also recently announced your Phase 2b/3 strategy. Can you discuss your plans there and how far that leaves you behind barzolvolimab's Phase 3 program?

Answer – Ronald A. Martell: Sure. So, **based on all this data we'll have at the midyear, we will be able to select the two doses to take into our Phase 2b**. Our Phase 2b that we propose to the regulators is an operationally adaptive design. So, that study will run. And at the conclusion of that study, we'll be able to roll seamlessly into our Phase 3, the dose that we choose from the Phase 2b portion of that study.

**So, we'll save anywhere from three to six months in the transit -- normal transition and maybe even longer. If we look at the barzo's timeline from finishing their study to getting into the Phase 3, that was more like nine-plus months. So, we'll be able to roll directly into that study**.

It's also important to note that that Phase 3 clinical trial, because we'll only be taking one dose into that study, will likely be required to enroll significantly less patients than what they did. Their safety database is requiring 2,200, 2,300 patients, where we would anticipate we would need to enroll somewhere between 1,300 and 1,500 patients, so 500 to 700 patients less than what they need to enroll. And that's a significant time advantage as well. **So, when we put all of that together, we think we're 12 to 18 months behind barzo**.

207.    Defendant Martell's statements in the paragraph above were materially false and misleading because, as detailed above, Martell failed to disclose that, as Defendants knew, cohorts

8 and 9 were subject to an especially high risk of including patients misdiagnosed with CSU. As a result, the Company faced a material, undisclosed risk that the "data" it would have "at midyear" would be confounded by the presence of patients without CSU and thus would not permit the Company to "select the two doses to take into our Phase 2b" study and would cause further delay to the timeline touted by Defendant Martell.

208.    On July 7, 2025, Jasper issued the press release entitled "Jasper Therapeutics Reports Clinical Data Update from Briquilimab Studies in Chronic Spontaneous Urticaria." The press release disclosed, *inter alia*, that

> Results from the 240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts appear to be confounded by an issue with one drug product lot used in those cohorts, with 10 of the 13 patients dosed with drug from the lot in question. The Company is investigating the drug product lot in question and expects to have the results of that investigation in the coming weeks. Key observations noted in those 10 patients were lower than expected drops in mean tryptase levels and no discernable impact on UAS7 scores. The 2 participants enrolled in the cohorts that have been confirmed as being dosed with drug product from a different lot both achieved complete response.

209.    This statement was false and misleading because it failed to disclose the possibility that the "confounding" of the results from the "240mg Q8W and the 240mg followed by 180mg Q8W dose cohorts" (i.e., cohorts 8 and 9) resulted from the inclusion of patients who had been incorrectly diagnosed with CSU (given the Company's then-undisclosed acceptance of patients without full medical histories and with only "minimal" documented history of CSU or CSU treatment, and the Company's inclusion of study sites that lacked any "certified Immunologist/Dermatologist with a history of diagnosing and treating CSU patients" and thus were especially likely to wrongly diagnose patients with CSU), especially because patients enrolled in those specific cohorts were not required to have tried omalizumab first and thus were subject to an especially high risk of an incorrect diagnosis.

AMENDED CLASS ACTION COMPLAINT

## VI. LOSS CAUSATION

210. On January 8, 2025, the Company issued a press release entitled "Jasper Therapeutics Reports Positive Data from BEACON Study of Briquilimab in Chronic Spontaneous Urticaria." The press release reported on data from 49 participants in the BEACON study.

211. Investors were confused and disappointed by the published results. Though certain cohorts showed excellent results, the critical 180 mg dose arm of the study underperformed. Management blamed the 180 mg dose underperformance on the improper inclusion of two patients who had been misdiagnosed as having CSU. Though unclear at the time, this was the first partial revelation to the market that Jasper had (i) not been conducting the BEACON study in compliance with federal regulations and had failed to retain "investigators qualified by training and experience as appropriate experts" as required by 21 CFR § 312.53(a), and (ii) enrolled patients in violation of the BEACON protocol that had strict inclusion criteria to ensure only patients with CSU were enrolled.

212. The poor test results in the 180 mg dose arm injected uncertainty and delay into the strict timeline Jasper needed to meet to be able to compete with Celldex. On this news, Jasper's stock price collapsed from a closing price of $17.71 on January 7, 2025 to a closing price of $6.99 on January 8, 2025, on exceptionally high trading volume of 6.6 million shares.

213. Analysts documented investor concerns. The William Blair analyst published a report on January 8, 2025, which stated in relevant part:

> On Wednesday, January 8, Jasper reported the initial results from the Phase I/II BEACON study of briquilimab in patients with chronic spontaneous urticaria (CSU) and held a conference call to discuss the data. Overall, the initial data do show strong efficacy for briquilimab across multiple cohorts, potentially exceeding UAS7 benefit in both depth and time to response s compared to Celldex's (CLDX $26.03) barzolvolimab. However the results show variability in terms of efficacy with a lack of clear dose response and underperformance of the 180 mg arm.

\* \* \*

67

AMENDED CLASS ACTION COMPLAINT

*Based on conversations with investors*, we believe the reaction was driven by a lack of clear dose-dependent efficacy results (driven by 180 mg dose level), the unclear dose relationship for safety events, and the need for additional dose exploration.

* * *

Management did provide potential rationale for underperformance of the 180 mg Q8W cohort, which enrolled 7 patients total (of which 5 patients were included in the calculation of UAS7 change, with 2 excluded due to data not available). Management noted that 2 of the 5 analyzed patients were clear non-responders. *Looking into their history in more detail, management believes that these 2 patients could potentially be misdiagnosed with CSU*. With censoring those 2 patients, the complete response rates and well-controlled disease response rates would have been 40% and 60%. However, we note that even with that censoring, the 180 mg Q8W cohort would have still underperformed the 120 mg Q8W cohort (50% and 75% rates, respectively).

214.    Analysts were in agreement. The Oppenheimer analyst wrote on January 8, 2025:

We suspected that we may not see a clear dose-response in BEACON due to the small patient numbers. Indeed, *one confusing point for investors* is lack of clinical response for the 180mg cohort, despite the expected drug exposure and serum tryptase reduction. *JSPR mentioned two potentially misdiagnosed patients (with urticarial vasculitis) in the 180mg cohort that may explain this observation*.

215.    The JMP analyst wrote: "The larger 180mg Q8W cohort underwhelmed showing little difference to placebo at week 12 (Q8W) and certainly underperformed barzolvolimab, *possibly due to 2/7 misdiagnosed patients*."

216.    On July 7, 2025 and July 9, 2025, Jasper hit investors with a one-two punch of bad news. *First*, Jasper revealed that *10 of the 12 patients* enrolled in BEACON cohorts 8 and 9 had no response to briquilimab. This was disastrous. Cohorts 8 and 9 were critical to determining the proper dosing of briquilimab for a registrational study. Accordingly, without positive test results, Jasper investors knew the Company could not commence a registrational study and FDA approval was (at best) delayed significantly. *Second*, only two days after revealing the negative test results, Jasper announced a major corporate restructuring was necessary to "to extend its cash runway, including a workforce reduction of approximately 50%." The negative BEACON trial test results

68

AMENDED CLASS ACTION COMPLAINT

effectively shut Jasper out of the capital markets; Jasper could no longer tap investors to fund its operations. This "workforce reduction" included Jasper's Chief Medical Officer Defendant Tucker, the man previously responsible for the BEACON study. Jasper laid the blame squarely at the feet of Defendant Tucker.

217. On July 7, 2025, the Company issued a press release entitled "Jasper Therapeutics Reports Clinical Data Update from Briquilimab Studies in Chronic Spontaneous Urticaria." This press release revealed that 10 of the 12 patients enrolled in cohorts 8 and 9 had no response to briquilimab. In this press release, Defendants concealed the true cause of the poor results – blaming the problem on a bad batch of briquilimab. The press release stated: "Results from [cohorts 8 and 9] appear to be confounded by an issue with one drug product lot used those cohorts."

218. Analysts were quick to pick up on the significant problem this created for Jasper, even though the analysts continued to be misled by the cause of the disappointing trial data. For example, on July 8, 2025, *RBC Capital Markets published an analyst report downgrading Jasper and taking its price target for the stock from $46 per share to only $5 per share*. This was a dramatic decrease. The RBC analyst noted the significance of the delay resulting from this negative test data: "Ultimately, as a result, timelines for a fulsome BEACON dataset will be pushed out" allowing for "key competitors like CLDX (likely 2-3 years ahead) [to] get entrenched." Changes in timing and the competitive landscape caused RBC Capital Markets to make "changes to our model" that resulted in dropping the its "12-month price target to $5 from $46."

219. Similarly, on July 7, 2025, Evercore ISI published an analyst report *dropping the Jasper target price from $50 per share to just $20 per share*. The analyst wrote:

Quick summary of today's CSU data update:

69

AMENDED CLASS ACTION COMPLAINT

Following the January data, we were expecting this data to catalyze financing for the P2b portion of their registrational CSU study

In this update, there was a drug product issue with 1 lot (looks like it was underdosed) which made much of this data uninterpretable at the key go-forward 240mg Q8W and 240mg / 180mg Q8W doses. Based on the consistency of all the other data shown to date, we believe this explanation and the fact that it will be addressable.

220.    William Blair also issued a report on July 7, 2025, which read:

Jasper disclosed that some of the multi-dose cohorts from BEACON were impacted by an inactive drug product lot, confounding the results and requiring re-dosing and additional patient enrollment. Unfortunately, the cohorts in question (240 mg Q8W and 240 mg/180 mg Q8W) *were of high interest as potential doses for pivotal development in the planned Phase IIb study, leading to a delay in dose selection and pivotal study initiation* (now estimated to start in mid-2026). . . .

*As a result of this setback, we are downgrading shares to Market Perform* . . .

221.    On this news, Jasper's stock price fell $3.73 per share, or 55.1%, from its July 6, 2025 closing price of $6.77, to close at $3.04 per share on July 7, 2025. This stock price decline was directly tied to Jasper's disclosure of the poor BEACON test results in cohorts 8 and 9. Though investors did not know it yet, because Defendants continued to conceal the truth from the market, the poor BEACON test results were directly caused by Jasper using insufficiently experienced and under-qualified investigators to enroll patients in cohorts 8 and 9 of the BEACON study, in violation of federal law and the BEACON study protocols as detailed herein, as well as the increased risk of improper patient selection resulting from the change to the patient eligibility criteria.

222.    Five months later, on December 2, 2025, before market hours, Jasper filed a Form 8-K with the SEC, attaching a press release

*announc[ing] the completion of its internal investigation into the anomalous lack of clinical response observed in the July 2025 BEACON data for cohort 8 (240mg Q8W) and cohort 9 (240mg /180mg Q8W), where no US patients (n=10) achieved Complete Response or Well Controlled UAS7 by week 12*. Based on the work completed, the additional data from subsequent dosing of the US patients and input from a panel of CSU KOLs, *Jasper has concluded that the unexpected efficacy*

70

*results observed in the US patients was not the result of any issues with the drug product. Rather, it was likely a result of patient selection issues, as it appears that 9 of the 10 patients in question did not have CSU as their symptoms were not mast cell-driven*.

223. The Form 8-K quoted Defendant Martell as stating: "Going forward, we are confident that the learnings from this investigation and the recommendations from our KOLs will help us minimize the enrollment of patients that may not have mast cell-driven disease."

224. The Form 8-K also attached a presentation entitled "ETESIAN Data + BEACON Investigation Update," dated December 2025, which stated that "one new site enrolled 5 patients into active arms of Cohort 8 &9 with no CR or WC responses," that that new site was a "[c]ommunity-based, clinical research center," and that "*[a]ll patients had **minimal** documented medical history of CSU or past treatments for CSU*" as shown in this excerpt from the presentation:

- One new site enrolled 5 patients into active arms of Cohort 8 & 9 with no CR or WC responses
  - Community-based, clinical research center
  - All patients had minimal documented medical history of CSU or past treatments for CSU

225. The presentation further stated that:

**Unexpected efficacy results appear to largely be the result of patient selection**
- Based on KOL panel review of the totality of the data, including the data on patients redosed with replacement DP lot, their feedback is as follows:
  - 9 of 10 patients that did not respond do not appear to have CSU
  - Not uncommon as CSU is a diagnosis by exclusion, other CSU studies have shown 25-30% of patients are incorrectly diagnosed

226. The presentation also stated that the "KOL panel" assembled by the Company – a group of experts – had made several recommendations "to ensure quality patient selection," as follows:

**KOL panel recommendations to ensure quality patient selection**
- Ensure sites utilized have a certified Immunologist/Dermatologist with a history of diagnosing and treating CSU patients
- Expanded review of patient history during screening including visual records of lesions
- Larger sample size in future studies should mitigate impact of non-MC driven CSU patients

71

AMENDED CLASS ACTION COMPLAINT

227. This news partially revealed that Defendants' statements concerning (1) the change of eligibility criteria for the BEACON study to remove the requirement that patients first try omalizumab were materially false and misleading, and (2) the addition of new sites and investigators in the BEACON study, were materially false and misleading. *First*, the announcements revealed that the BEACON study included sites and investigators with insufficient experience, including no certified immunologists or dermatologists and no history of diagnosing and treating CSU patients. Indeed, Defendants acknowledged that they had added a "community-based site" that enrolled patients with "*minimal* documented history of CSU or past treatments for CSU." *Second*, it revealed that the study took insufficient steps to determine whether potential enrollees had CSU; for instance, it did not require a sufficiently robust review of patient history and did not require visual records of lesions.

228. Further, this news constituted the materialization of the undisclosed risks (1) that, as a result of Company's change of eligibility criteria for the BEACON study to remove the requirement that patients first try omalizumab, patients without CSU would be enrolled, and (2) that, as a result of the Company adding unqualified sites and investigators to the BEACON study, patients without CSU would be enrolled, leading to study results showing a lack of briquilimab's efficacy for CSU and delaying the progress of the Company's IND application for briquilimab in CSU.

229. On this news, Jasper's stock price fell $0.14 per share, or 8.14%, to close at $1.58 per share on December 2, 2025.

230. On January 7, 2026, after market hours, Jasper filed a Form 8-K with the SEC announcing that "[o]n January 2, 2026, the Board of Directors (the 'Board') of Jasper Therapeutics, Inc. (the 'Company') determined that, effective January 5, 2026, Ron Martell would cease serving as the Company's Chief Executive Officer and President." The Form 8-K also

72

AMENDED CLASS ACTION COMPLAINT

disclosed that "Mr. Martell's departure from the Company constitutes a termination without Cause," and that "[p]ursuant to the Martell Employment Agreement, on January 5, 2026 concurrently with Mr. Martell's departure as the Company's Chief Executive Officer and President, he automatically resigned from the Board." The Form 8-K announced that "[e]ffective January 5, 2026, the Board also appointed Jeet Mahal, the Company's current Chief Operating Officer, as the Company's Chief Executive Officer and President," and that Mr. Mahal had also been appointed to the Board. The Form 8-K quoted Thomas Wiggans, the Chairperson of the Board, as stating that "Jeet's strategic vision and *deep experience in therapeutic development* make him an ideal person to drive value for our stockholders and, most importantly, for the patients we serve." This made clear to investors, though it was already clear from the timing, that Defendant Martell's abrupt termination as CEO was directly connected to his management of the Company's IND application for briquilimab in CSU.

231.    Then, before the market opened the next day, January 8, 2026, convened a conference call to present updated data from the BEACON study and the Company's open-label extension study in CSU and CIndU. During that call, the first analyst question was: "can you just give us a little bit of a sense with the change in CEO at this point, what was the thinking behind it and why do it now, so to speak?" In response, Mr. Mahal stated that

> this was a decision driven by the Jasper board, looking at the development stage of the company and the next stage of leadership needed to move the program forward into Phase 2b and pivotal studies. So the board asked that I become the CEO, given my track record in development of multiple therapeutics from Phase 1 or Phase 2 through BLA or NDA submission.

232.    This made even more clear that Martell's departure was directly related to his management of the Company's IND trials for briquilimab in CSU.

233.    On this news, Jasper's stock price fell $0.39 per share, or 19%, to close at $1.66 per share on January 8, 2026.

AMENDED CLASS ACTION COMPLAINT

234.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.    THE INDIVIDUAL DEFENDANTS CLOSELY MONITORED THE BEACON STUDY

235.    A strong inference that the Individual Defendants acted with scienter is established by the facts alleged above, as well as the fact that they closely monitored the BEACON study throughout the Class Period. Large swaths of the Company's personnel were tasked with tracking the study and distributing data regarding its progress throughout the Company and up to senior management.

236.    FE-3, who worked as a Director of Project Management from 2022 until early 2023, was directly involved in overseeing the Company's development of briquilimab for CSU, which later includes the BEACON study. FE-3 and other members of their team tracked the CSU program holistically, including enrollment timelines and budgets. The team held weekly project meetings to develop the protocol for the phase 1 study for CSU, including eligibility criteria and other aspects of study design, as well as to prepare documents that would be submitted to the FDA in connection with the CSU program.

237.    FE-2 was a clinical data manager from late 2024 until early June 2025. FE-2 prepared clinical trial data for use by different internal stakeholders. For instance, Jasper's operations department used it to track study progress, while safety and medical teams used such data to review outcomes and potential safety issues. Directors tracked study progress and met with C-suite executives regarding the data. Executives would periodically make in-person visits to the clinical data management to discuss the details of how clinical trials were progressing. FE-2 attended regular meetings related to the studies FE-2 was working on, which included the BEACON study as well as a study for briquilimab to treat asthma. Directors tracked studies on a

74

weekly basis, and Vice President of Clinical Operations Abby Kennedy attended these weekly trial meeting updates. Moreover, about once a month, Defendants Martell and Tucker joined these meetings to review the details of how the studies were progressing.

238.    In addition, per FE-2, Jasper conducted "targeted reviews" of clinical studies. In such reviews, the Company's medical monitor would review data from a clinical trial to assess whether values were within expected ranges. The findings of a targeted review were provided to Jasper's directors, who would then meet to discuss the findings and decide the next steps. In meetings in April and May 2025, the results of a targeted review of the BEACON study were discussed. FE-2 attended those meetings, where FE-2 learned that the CSU study had relatively few patients enrolled. There were so few patients, and thus little data, that management decided to reduce the frequency of data reviews for the study. At that time, the Company planned to conduct a more "comprehensive" review of the BEACON study. However, FE-2 left the Company before that comprehensive review was conducted.

239.    Senior management, including the CMO, tracked the progress of clinical studies through regular reporting. FE-2 said the C-suite received "regular reports, weekly reports or so" from the Contract Research Organization (CRO) and from Jasper's clinical operations team. FE-2 explained that monitoring was conducted through CRAs, or clinical research associates, who "go to monitor the sites."

240.    FE-4 was a senior member of Jasper's clinical development team from April 2024 until February 2025. FE-4 reported directly to Defendant Tucker and interacted with Defendant Martell as well. Per FE-4, "it was a small company," Tucker was "very hands on" with respect to clinical trials, and Martell was "well aware of everything." Generally, the C-Suite officers were "very demanding" and "very much hands on." FE-4 reported that Jasper closely monitored patient enrollment in clinical trials, and Tucker tracked the progress of trials, receiving weekly reports

75

from Jasper's clinical operations teams and from the contract research organizations retained by Jasper. FE-4 reported that senior management pushed for fast enrollment of patients in studies because the Company was constantly facing pressure to report study results so that it could secure additional funding to continue its development programs.

## VIII. CLASS ACTION ALLEGATIONS

241. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Jasper's publicly-traded securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures and materialization of the misrepresented risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

242. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Jasper securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Jasper or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

243. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

244. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

245. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Jasper;

- whether the Individual Defendants caused Jasper to issue false and misleading updates on the BEACON study during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading updates on the BEACON study;

- whether the prices of Jasper securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

246. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

247. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

77

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Jasper securities traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Jasper securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

248. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

249. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    COUNTS

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

250. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

78

AMENDED CLASS ACTION COMPLAINT

251.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

252.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Jasper securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Jasper securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

253.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases, presentations, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Jasper securities. Such reports, filings, releases, presentations and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Jasper's operations and business prospects.

254.    By virtue of their positions at Jasper, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

79

thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

255.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Jasper, the Individual Defendants had knowledge of the details of Jasper's internal affairs.

256.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Jasper. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Jasper's business, operations and future prospects, including regarding the BEACON study. As a result of the dissemination of the aforementioned false and misleading reports, releases, presentations and public statements, the market price of Jasper securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the BEACON study, which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Jasper securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

AMENDED CLASS ACTION COMPLAINT

257.    During the Class Period, Jasper securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Jasper securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Jasper securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Jasper securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

258.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

259.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure of the truth regarding Defendants' misstatements and the materialization of the risks misrepresented by Defendants.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

260.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81

AMENDED CLASS ACTION COMPLAINT

261.    During the Class Period, the Individual Defendants participated in the operation and management of Jasper, and conducted and participated, directly and indirectly, in the conduct of Jasper's business affairs. Because of their senior positions, they knew the adverse non-public information about the BEACON study.

262.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Jasper's business, operations and future prospects, including regarding the BEACON study , and to correct promptly any public statements issued by Jasper which had become materially false or misleading.

263.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Jasper disseminated in the marketplace during the Class Period concerning Jasper's business, operations and future prospects, including regarding the BEACON study. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Jasper to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Jasper within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Jasper securities.

264.    Each of the Individual Defendants, therefore, acted as a controlling person of Jasper. By reason of their senior management positions and/or being directors of Jasper, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Jasper to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Jasper and possessed the power to

AMENDED CLASS ACTION COMPLAINT

control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

265. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Jasper.

## X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: February 17, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jonathan D. Park*

Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
Jonathan D. Park
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor

83

AMENDED CLASS ACTION COMPLAINT

Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Co-Lead Plaintiffs Rhys Brooks and Jonathan Otte and Additional Plaintiff Sandra Lynn Grant and Co-Lead Counsel for the Class*

THE ROSEN LAW FIRM, P.A.

Laurence M. Rosen, Esq. (SBN 219683)
Matthew P. Siben (SBN 223279)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
Email: msiben@rosenlegal.com

*Counsel for Co-Lead Plaintiff Kenneth Allard and Co-Lead Counsel for the Class*

THE SCHALL LAW FIRM
Brian Schall (SBN 290685)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff Kenneth Allard*

84

AMENDED CLASS ACTION COMPLAINT